Lola M. Adams v. Continental Life Insurance Company, Employer, and General Accident Fire & Life Assurance Corporation, Insurer, Appellants.—101 S. W. (2d) 75.

Division One, January 5, 1937.

*James P. Aylward, James A. Waechter* and *Frank P. Aschemeyer* for Continental Life Insurance Company.

*Allen, Moser & Marsalek* for General Accident Fire & Life Assurance Corporation.

*Francis McCurlee* and *Richard F. Moll* for Lola M. Adams.

422

BRADLEY, C.—This is a compensation case in which claimant sought an award of $11,250. A referee found for claimant as to the employer, but found that the liability policy in the insurer company did not cover the accident. Both claimant and the employer filed their separate applications for review by the full commission. On review before the full commission, compensation was denied, the commission finding that it was without jurisdiction. From the finding of the commission denying compensation claimant took the necessary steps for appeal to the circuit court. On hearing in the Circuit Court of St. Louis, the order of the commission denying compensation was disapproved and the cause remanded to the commission with direction to find that claimant was ''entitled to compensation . . . from employer and insurer.'' From the finding and judgment of the circuit court both employer and insurer appealed to this court. Separate appeals were taken, but joint abstract filed and the two appeals considered together.

Claimant's husband, Morton A. Adams, while in the employ of the Continental Life Insurance Company of St. Louis, was killed in an automobile accident in South Dakota, on November 12, 1932. At that time, the employer carried with the General Accident Fire & Life Assurance Corporation, a liability policy covering its em-

ployees for accidents occurring in Missouri or elsewhere, if the employee was at the time in the course of his employment under a contract made in Missouri, where the contract of employment did not otherwise provide. Hereinafter, we refer to the Continental Life Insurance Company as the employer, or the Continental, and to the General Accident Fire & Life Assurance Corporation as the insurer.

Deceased, from February 1, 1924, to October, 1931, was in the employ of the Continental at Pierre, South Dakota. In October, 1931, he was called to the home office in St. Louis, and remained there until August, 1932, when he was sent back to Pierre to perform certain services for the employer. He was instructed to return to St. Louis when these services were finished, which would be about December, 1932, according to estimate. Prior to the employment of deceased with the Continental, he was in the employ of the First National Life Insurance Company of Pierre, South Dakota. In February, 1924, the Continental took over the business and properties of the First National, and Adams, the deceased, continued with the Continental in South Dakota, doing the same character of work that he had theretofore been doing for the First National, and for the same pay, $225 per month. His services while at Pierre, concerned leases, rents, taxes and "everything in a general way connected with real estate." On review before the full commission it was found that "the contract of employment under which employee was working at the time of the accident was made in 1924, and that there was not a new contract made when employee was transferred to St. Louis in 1931. We further find that there is not sufficient competent evidence in the record to show where the contract of 1924 was made, and, since the accident occurred in the State of South Dakota, it must be shown that the contract of employee was a Missouri contract or else we have no jurisdiction. As stated heretofore, the evidence does not show the *situs* of the contract, so we are therefore without jurisdiction."

As appears from the finding of the commission there was no finding as to dependency of claimant and no finding as to whether the accident arose out of and in the course of employment of deceased, but the view we take on the question of the new contract, it will not be necessary to deal with other questions. Both the employer and the insurer contend that there was sufficient competent evidence to support the finding of the commission that there was *not* a new contract entered into *in* Missouri, when deceased was transferred to St. Louis in 1931. The insurer, however, contends that if there was such new contract, the policy does not, in any event, cover the accident to deceased. The employer, while joining the insurer on the question of a new contract, contends that if there was such contract, the accident to deceased was covered by the policy.

■ Was there any sufficient competent evidence to support the finding of the commission that there was not a new contract entered into in Missouri, when deceased was transferred to St. Louis in 1931? Findings of fact made by the commission, if sustained by sufficient competent evidence, are, absent fraud, conclusive on appeal, and in determining the sufficiency of the evidence upon which the commission based its finding, we consider the evidence in the light most favorable to the finding and disregard evidence which might support a different finding than made. [Sec. 3342, R. S. 1929, Mo. Stat. Ann., p. 8275; Wadley v. Employers' Liability Assurance Corp., 225 Mo. App. 631, 37 S. W. (2d) 665; Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601; Doughton v. Marland Refining Co., 331 Mo. 280, 53 S. W. (2d) 236; Hoffman v. Missouri Pacific Railroad Co. (Mo. App.), 63 S. W. (2d) 427; DeMoss v. Evens & Howard Fire Brick Co. (Mo. App.), 57 S. W. (2d) 720; Gillick v. Fruin-Colnon Construction Co., 334 Mo. 135, 65 S. W. (2d) 927; Hinkle v. Miller (Mo. App.), 56 S. W. (2d) 825; King v. Mark Twain Hotel Co. (Mo. App.), 60 S. W. (2d) 675; and Kiser v. O'Connell Painting Co. (Mo. App.), 60 S. W. (2d) 636.]

On the other hand, the findings of fact by the commission are not conclusive on appeal if not supported by sufficient competent evidence. [Sec. 3342, supra; Doughton v. Marland Refining Co., supra; Sawtell v. Stern Bros. & Co., 226 Mo. App. 485, 44 S. W. (2d) 264; Hassell v. Reineke Lumber Co. (Mo. App.), 54 S. W. (2d) 758; Johnson v. Reed, 224 Mo. App. 1120, 32 S. W. (2d) 107.]

■ If the deceased, at the time of the accident, was working under a contract made in Missouri, and which did not otherwise provide, then the commission had jurisdiction, even though the accident resulting in his death occurred in South Dakota or elsewhere. [Sec. 3310, R. S. 1929, Mo. Stat. Ann., sec. 3310, p. 8245; Shout v. Gunite Concrete & Construction Co., 226 Mo. App. 388, 41 S. W. (2d) 629; State ex rel. Brewen-Clark Syrup Co. v. Missouri Workmen's Compensation Commission, 320 Mo. 893, 8 S. W. (2d) 897.]

In view of the respective contentions on the alleged new contract, a somewhat extensive statement of the facts is required. On the question of the alleged new contract, we might state here that it is conceded that prior to going to St. Louis, the services of deceased for the Continental were confined to North and South Dakota, Montana and Nebraska, but the greater part was in North and South Dakota. The employer, after it took over the First National withdrew in November, 1930, from South Dakota, so far as concerned its life insurance business, but continued to look after its properties there, acquired from the First National, and any other properties it had there. Louis Marks, secretary of the Continental, was a witness for claimant and testified that deceased was an employee of the Continental for about eight years; that his (deceased's) headquarters,

prior to the withdrawal of the Continental from South Dakota, were at Pierre; that after the withdrawal deceased came to St. Louis in the fall of 1931, and was given desk space in the home office and put in all his time there; that prior to coming to St. Louis, deceased operated as an employee of the Continental in North and South Dakota; that deceased, when at Pierre, had desk space in the Continental's building there, and that "he was brought into St. Louis and given desk space the same as any other employee in the home office;" and "had the use of the stenographer all the time he was here;" that part of the time he was provided with a personal stenographer. Marks further testified that after deceased went to St. Louis, he handled all the real estate of the Continental, which real estate was scattered over thirty-three states; that prior to going to St. Louis, deceased was paid by check from the home office, and that thereafter the salary was deposited at the home office in a savings account of deceased.

The deposition of W. A. Mays, manager of the real estate department of the Continental, was read in evidence on behalf of claimant, and on the subject of the services of deceased before going to St. Louis, Mays testified that such services were limited to North and South Dakota, Montana and Nebraska, but that the Continental had only one real estate holding in Montana and one in Nebraska, and that deceased collected rents, interest, principal, negotiated sales, subject to approval, and was the sole representative of the Continental in the four States mentioned; that deceased went to St. Louis "at the instance of a letter from the office here in St. Louis." "Q. And you know that of your own knowledge? A. I do know that of my own knowledge. Q. Do you know who wrote that letter? A. No, I don't know exactly who wrote the letter, but I know it was discussed in my presence that he was being brought into the home office. Q. A carbon copy of the letter to which you refer, of course, would be found in the files of the company, wouldn't it? A. It would. Q. Did you talk to Mr. Adams when he arrived in St. Louis? A. I did. Q. State what was said to Mr. Adams at that time with reference to his duties as employee of the Continental Life. A. I stated to him that his duties would be to continue to manage the property in North and South Dakota, and that he would also take on additional duties to assist me in managing—leave out the managing—to assist me in securing information regarding taxes on all of our investments in many states in which we operate. Q. Were any other additional duties to be turned over to him? That is, I am referring to your discussion with him when he was in St. Louis. A. That was the only duty that he was to perform which I have mentioned. Q. Did you discuss with him the matter of where his headquarters would be? A. No, not decisively. My general under-

standing— Q. Just tell what you said to him, with reference to where his headquarters would be. A. What have I said, so far, please? (Last answer repeated by the reporter.) The WITNESS: Just leave it as: no. (Mr. Marsalek, representing the insurer): Q. Do you want to change the answer to plain 'No?' A. Yes, that is it. Q. As a matter of fact, do you know where his headquarters were after his arrival in St. Louis, and taking up his new duties? A. As manager of the department, it was our intention that he make his headquarters here in St. Louis. Q. They were in St. Louis; is that correct? A. Yes, sir. Q. To sum up the matter, then, is it correct that upon Mr. Adams' arrival in St. Louis you discussed with him the matter of his taking up new duties in addition to the work which he had performed before for the company, the new duties being assisting in tax matters? A. Soon after he arrived at the office I informed him that he would take on the additional duties of assisting me in tax matters. Q. Did he consent to take on those new duties? A. He did. Q. Some time thereafter, did Mr. Adams leave St. Louis? A. Yes. Q. Can you estimate approximately how long afterwards he left St. Louis? I am referring, of course, to the conversation when he first came to St. Louis. A. Four to six months. Q. Meanwhile, had he been working in St. Louis in the office here? A. Yes. Q. When he left St. Louis, did he go on company business? A. Yes. Q. Where did he go, Mr. Mays? A. To Pierre, South Dakota.'' Mays further testified that Miss Izola Alvey, stenographer, ''devoted all of her time to tax matters as his (deceased's) secretary on taxes. He had a separate secretary for other matters.''

On cross-examination Mays testified: '·Q. Was Mr. Adams brought to St. Louis from South Dakota so that you or other officials of the company might personally confer with him relative to the properties owned by the company in North and South Dakota? A. Mr. Adams was brought to the home office to more closely familiarize the other officers in charge of the management of the investments of the company and to remain here and work from this office. Q. I will ask you whether he went back to South Dakota when he went back on the occasion just previous to his death, whether he went there under instructions given him by you orally? A. Yes. Q. I will ask you whether those instructions were that he was to return there to renew leases and look over other matters concerning the company's holdings over in South Dakota? A. Yes. Q. Had you fixed a time that he was to stay up there—definite time—during which he was to stay, and after which he was to return again to St. Louis, in any conversation or instructions given him? A. Yes, I gave him the instructions personally before leaving, that he was to go to North and South Dakota, to collect the rents, interest, principal, maturities,

make sales subject to our verification, and to return as quickly as these were completed, which he estimated would be November or first of December."

Miss Alvey, a witness for claimant, testified: "Q. During the period you have been employed by the Continental Life, did you meet Mr. Mortan A. Adams? A. I did. Q. What department are you in? A. Taxes; real estate and investments, and that works with taxes. Q. Your work is confined to the tax work? A. Yes. Q. What type of work—when did you first meet Mr. Adams? A. June a year ago. Q. June, 1932? A. Yes. Q. What was the occasion of your meeting? A. I went to work for him. Q. What was his title or position with the Continental Life at the time you went to work for him? A. He worked in the department and the letters were signed, 'Real Estate or Investments', no title. Q. Were you his secretary or stenographer? A. I was. Q. Did Mr. Adams do any tax work for the Continental Life Insurance Company during the time you were his secretary? A. He did. Q. Can you give me an idea or give the court an idea what the nature of those duties were? I am referring to Mr. Adams' duties. A. We were assessing the value of property; and the record of taxes, whether or not they were paid, letters to the persons requesting they pay their taxes and continually followed them up. Q. Was that with reference to any and all of the real estate owned by the Continental Life? A. Yes." By Referee WHITE: "Q. Outside of Missouri also? A. Everywhere; mortgage lines as well as real estate, collateral."

S. D. Burchart, cashier of the Continental, was a witness for claimant and testified that he had charge of the pay roll of the employer, regardless of where the employee was located, in Missouri or elsewhere; that prior to the fall of 1931, checks to pay deceased were delivered to the head of the real estate department and that he presumed "they mailed it to him;" that prior to deceased's going to St. Louis, his salary was classified "as a field man and charged to an account in our books as investment expenses, and that after he went to St. Louis, a change was made and instead of giving a check to deceased, he was paid at the home office by a savings pass book. "Q. Will you describe that method of payment? A. The reason for that was 10 per cent of the pay was put in one's savings account in the employee's name and the balance, or 90 per cent, was placed in another savings account in the employee's name, which was subject to withdrawal, immediately at the disposal of the employee. Q. Were both of those savings accounts or was one a checking? A. Both savings accounts. Q. Was this method of payment carried out in the case of Mr. Adams subsequent to his coming to St. Louis in the fall of 1931? A. It was. Referee WHITE: Q. Was that the method prior to that time? A. No, he was paid

by check prior to that. MR. MOLL (resuming). (Q): He was sent a check for the full amount of his salary prior to his coming to St. Louis? A. Yes. Q. That later plan you spoke of where deposits were made, one for 10 per cent and one for 90 per cent of the salary, was that confined solely to employees of the Continental Life whose location was at the home office in St. Louis? A. It was.''

Claimant introduced in evidence the original answer of the employer, which answer admitted as true, all of the statements in the claim for compensation. (The claim did not make any reference to the *situs* of the contract under which Adams was working.) Also, claimant introduced the first amended answer, in which both the employer and insurer joined, and in this answer all statements in claimant's claim were admitted. However, it is alleged, in this joint answer, that the contract of employment of deceased was not made in Missouri, but in South Dakota. The claim was heard on the original claim filed by claimant and on a second amended joint answer. The second amended joint answer differs from the first joint answer in that in the former it is alleged for the insurer ''that on April 18, 1932, it issued to the employer, Continental Life Insurance Company, a standard workmen's compensation and employer's liability policy for a term of one year; that at the specific request of the employer, on May 3, 1932, said policy was amended by an endorsement duly executed and attached thereto, which amendment provided that in consideration of a return premium of $3.16, it was understood and agreed that effective April 18, 1932, coverage for the State of South Dakota was entirely eliminated from said policy, and said General Accident Fire & Life Assurance Corporation further states that it issued to the employer no compensation or liability insurance policy for or during the term referred to, other than the policy above mentioned; and said General Accident Fire & Life Assurance Corporation denies that it covers or insures against or is liable to pay compensation for the alleged injury and death of Morton A. Adams, referred to in the claim for compensation herein filed.''

The above allegations by the insurer constitute the foundation for the contention that the insurer was, in no event, liable. It appears that the estimated premium charged by the insurer to cover liability under the South Dakota Compensation Act, so far as here concerned, was $3.16, and it also appears that the rider amendment attached to the policy on May 3, 1932, was at the instance of the employer and that the premium returned when the rider was attached was $3.16. Claimant invokes the change in the policy and the audits, hereinafter mentioned, as circumstances tending to support her contention that a *new contract* was entered into when deceased was called to the St. Louis office in the fall of 1931.

Deceased was called from the office of his employer in South Dakota

to its home office in St. Louis, and the scope of his duties enlarged considerably as appears above. The scope was extended to assisting the manager of the real estate department "in securing information regarding taxes on all of our investments" in the thirty-three states where the employer had real estate holdings. Prior to going to St. Louis deceased's activities were confined to the four states above mentioned. Also, it appears, from claimant's evidence, that after deceased went to St. Louis, his headquarters were to be there. Soon after he arrived in St. Louis he was informed by the manager of the real estate department that "he (deceased) would take on the additional duties" and deceased *consented* "to take on those new duties." He was brought "to the home office to more closely familiarize the other officers in charge of the management of the investments of the company and to remain here (St. Louis) and work from this office." The employer carried a liability policy with appellant insurer covering the period from April 18, 1932, to April 18, 1933. Audits of the pay roll of the employer were made, and the audit of the pay roll prior to the time that deceased went to St. Louis shows that his salary was included in the pay roll of South Dakota, upon which pay roll was based the premium charge for coverage under the South Dakota Compensation Law. It appears from the audits covering the period from October 1, 1931, to October 31, 1932, the last pay day for deceased, that the salary of deceased was included in the Missouri pay roll.

We have set out above the evidence offered in support of claimant's contention that deceased, at the time of his death, was working under a new contract *made in Missouri*. It appears that when deceased left Pierre, South Dakota, for St. Louis, in the fall of 1931, that he left his personal effects in tact in the room he occupied as an office and living quarters in the employer's building in Pierre, and when sent back to Pierre in August, 1932, he again occupied these quarters. While in St. Louis he voted by mail at a primary election held in Pierre, in May, 1932, and voted personally in Pierre at the general election held on November 8, 1932, four days prior to his death. From this it would appear that deceased regarded himself as a legal resident of South Dakota. However, the fact that he was a legal resident of South Dakota would not, of itself, defeat compensation. [Daggett v. Kansas City Structural Steel Co., 334 Mo. 207, 65 S. W. (2d) 1036; Bolin v. Swift & Co. et al., 335 Mo. 732, 73 S. W. (2d) 774, and cases there cited.]

The insurer introduced before the commission a statement made December 30, 1932, by Louis Marks, secretary of the employer, whose evidence we have set out, supra. In this statement Marks stated that in 1924 or 1925 the Continental bought out the First National Life Insurance Company of Pierre, South Dakota; that he and P.

M. Harper, then a vice president of the Continental, went to Pierre "to handle various deals connected with the transfer;" that they were in South Dakota "on this business" for three or four months; that Morton Adams had been an employee of the First National before that company was taken over by the Continental; that his duties were to act as "real estate field man," inspecting and valuing property, looking after leases and repairs and similar duties; that the First National had in their employ numerous employees, "many of whom were dropped when or shortly after the Continental took over the First National's business. Some of the First National employees, however, were retained and among them was Morton Adams;" that thereafter, Adams continued to perform the same duties for the Continental that he had previously performed for the First National, "looking after the various parcels of real estate located in South Dakota, taking care of repairs, leases, inspections and like duties;" that for several years after the purchase of the First National the Continental maintained an office in South Dakota, but that this office was closed and that "about October, 1931, Mr. Adams came to St. Louis and remained here for a number of months;" that "his dealings during this period were with Mr. W. H. Mays, the manager of the real estate department. I had no personal dealings with Adams during that period, but it is my understanding that the purpose of his visit to St. Louis was to go over with Mr. Mays, his superior, the details relative to the various parcels of property located in South Dakota, in which the Continental Life Insurance Company was interested. At the conclusion of his visit to St. Louis, Mr. Adams returned to South Dakota, and continued in the employ of the Continental Life Insurance Company as theretofore, until the time of his death. I have no personal knowledge of any change being made in the conditions of his employment or the nature of the work performed by him from the time the Continental Life Insurance Company took over the First National Life Insurance Company up to the time of his death. I have no personal knowledge of any new or different contract of employment being made between Morton Adams and the Continental Life Insurance Company after he was originally employed in South Dakota until the time of his death. Mr. W. H. Mays, Adams' superior, is the only official of the Continental Life Insurance Company who had authority to make any change in the arrangements effecting the employment of Mr. Adams by the Continental Life Insurance Company."

Section 3342, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3342, p. 8275), provides, among other things, that on appeal, the court shall review only questions of law and may modify, reverse, remand for rehearing or set aside the award upon certain named grounds, one of which is "that there was not sufficient competent evidence in the

record to warrant the making of the award.'' In Doughton v. Marland Refining Co., supra, it is stated (331 Mo. 280, 53 S. W. (2d) l. c. 240) that "in practice the commission does not sustain demurrers to complainants' evidence. It hears all the evidence either party may have to offer and bases its findings and award upon the whole evidence, which, of course, requires determination of the weight and credibility of conflicting evidence, the drawing of permissible inferences from proved facts, etc., as would be done by a jury in determining the facts. Section 3339, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3339), contemplates that, with its award, the commission shall make and file 'with the record of proceedings,' a statement of the facts found by it. That means the ultimate facts, not evidentiary facts upon which the ultimate facts depend. [Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601, 603.] It has been held that, even though the commission has stated only a legal conclusion rather than a finding of fact, its award will not be reversed if its conclusion is supported by sufficient competent evidence (Waring v. Met. Life Ins. Co., 225 Mo. App. 600, 39 S. W. (2d) 418, 423; Metting v. Lehr Constr. Co., 225 Mo. App. 1152, 32 S. W. (2d) 121), which question is to be determined from the facts taken in the light most favorable to the conclusion of the commission. [Metting v. Lehr Const. Co., supra.]''

The burden was on claimant to establish that at the time of the accident resulting in the death of her husband, he was in the course or scope of his employment under a contract made in Missouri. Possibly it might be inferred that the contract of 1924 was made in Pierre, South Dakota, but the commission did not so find. However, such is not important, because claimant rests her case on the theory that a *new contract* was made *in* St. Louis when deceased was called to the home office of the Continental in 1931.

Our attention is not called to and we find no case in our own jurisdiction that aids us much on the question of the alleged new contract. Employer and insurer, appellants here, to support their contention that there was substantial evidence to support the finding of the commission, cite Hartman v. Union Electric Light & Power Co., 331 Mo. 230, 53 S. W. (2d) 241; Selser v. Bragman's Bluff Lumber Co. (La.), 146 So. 690; Pettiti v. Pardy Construction Co. (Conn.), 130 Atl. 70. In the Hartman case the deceased was employed by the Union Electric at Rivermines, St. Francois County, Missouri, in the construction of a substation at Rivermines. The employee, concerned in that case, was employed December 31, 1929. May 28, 1930, one Couch was appointed superintendent of transmission and his jurisdiction was extended over the transmission lines between Cahoka, Illinois, and Rivermines, Missouri. After Couch took charge of the transmission lines he sent the employee to Illinois twice. The first

time was on a Sunday; the second time was September 3rd to 6th, both inclusive, 1930. On September 6th, Hartman, the employee, fell and was killed. Of the character of the work he was doing at the time of his fall and death the opinion shows: ''Q. Did you have any men working over there prior to the time you sent Mr. Hartman over? A. No; not on maintenance. Q. What kind of work were they doing? A. More construction work, installing some porcelain signs on the tower—a number of signs. When a plane goes over the line they could read the tower numbers from the air—large porcelain signs, letters six inches. Q. Was that temporary work in Illinois or was it permanent transfer, Mr. Couch? A. It was just a small job. They had almost completed the job that afternoon when he got hurt; another three hours, come back, and wouldn't have further work over there for two weeks. Q. Then this permanent job was at Rivermines, Missouri? A. Yes; I would say it was, because he hadn't been transferred over to the transmission department. Q. And his original contract was entered with you at Rivermines? A. Yes.''

The employer and insurer in the Hartman case contended that when Hartman went to Illinois to work on the transmission towers, he and the employer in legal effect modified the contract of employment by substituting for the Missouri Compensation Act the automatic section of the Illinois Compensation Law relating to hazardous business. The court disallowed the contention made. There was no contention made in that case that a *new contract* was made. The contention was that, because of the compulsory nature of the Illinois law, Hartman's contract was, *in legal effect,* so modified as to incorporate in it the Illinois law.

In the Selser case, supra, a Louisiana compensation case, it appears that the deceased Selser was employed in New Orleans and was killed in Nicaragua, while in line of duty. It was contended, among other things, by the employer, a Louisiana corporation, that the contract of employment was changed and that a new contract was entered into in Nicaragua. Under the contract of employment the services of the deceased were to be rendered exclusively in Nicaragua. The deceased was employed May 10, 1927, as a stenographer, at a salary of $150 per month, plus board, lodging, transportation, etc. Later and after deceased had arrived in Nicaragua he was promoted ''to a position of general inspector of all equipment, tools and properties of the company at a salary of $225 per month,'' which latter position he was occupying at the time of his death. In disposing of the new contract question the court said: ''As we view the evidence, the deceased acted under the same contract of employment from the time he was engaged until the time of his death, because the change in his position and the increase of his salary was merely a promotion *which also had to be approved by the New Orleans office before it became effective.*

The original contract as to board and lodging and transportation was still in effect and in no way abrogated or set aside.'' (Italics ours.)

If the promotion in the Selser case had to be approved in New Orleans before effective, then, if it was in fact a new contract, the *situs* was in Louisiana. The *situs* of a contract is the place where the final act is performed to make it effective. [Johnston v. Industrial Comm., 352 Ill. 74, 185 N. E. 191; Bolin v. Swift & Co. et al., supra.] So in any event a correct conclusion was reached in the Selser case.

The Pettiti case, supra, was for compensation. The employer was a general building contractor, having its principal office in Bridgeport, Connecticut, and did business in Connecticut and other states. Early in 1924 the employer secured a contract to build a parochial school in Webster, Massachusetts. Pettiti was in the employ of the defendant employer at Bridgeport when the Massachusetts contract was obtained. At Bridgeport, the employer gave Pettiti the option of working on the Massachusetts job at an increase in pay of twenty cents an hour. He accepted in Bridgeport and went to the Massachusetts job as foreman of the laborers until the early part of August ''when he had a difference with the superintendent, who told him to get off the job,'' which he did and returned to Connecticut. He was laid off temporarily as a disciplinary measure, but was not discharged. In five days he was taken back on the job and continued as before. When the weather became cold the superintendent made arrangements with Pettiti ''to look after the boilers and keep the fires burning'' for which he was to receive extra pay. While taking care of the furnace fires he met with an accident resulting subsequently in his death. The contention was made that the contract under which Pettiti was working when injured was made in Massachusetts. This contention was on the theory that when Pettiti went back on the job he was ''reemployed under a new contract'' which was made in Massachusetts. Also, it was contended that ''tending the boilers was a new contract and independent of Pettiti's contract as foreman of the laborers,'' and that this new contract was made in Massachusetts. It was ruled that there was no new contract; that ''there was only one contract of employment, and a change of the work done, or the compensation paid the employee, would not change the relation existing between this employer and employee. The doing of additional work for increased pay was an incident of the contract of employment. To hold otherwise might, in some cases, where the day's work was distributed among several lines of work, create as many different contracts of employment, and with every new piece of work outside the particular work for which the employee was employed a new contract would be formed. The work done at one time would be under the Connecticut Compensation Act (Gen. Stat. 1918, secs. 5339-5414) while just succeeding its performance, the next work done would be

under another State Compensation Act. The result would be a situation intolerable to both employer and employee.'"

As appears, supra, in the excerpt quoted from the Doughton case, the commission in finding facts, functions like a jury, that is, the weight of the evidence and the credibility of the witnesses are questions solely for the commission. That such is the rule is not questioned. Under the facts the commission found that there was not a *new contract* made when deceased was transferred to St. Louis in 1931. The inference is that when the insurance policy was changed, as stated above, the employer regarded that Adams was covered by the Missouri Compensation Law, but such could not be the case, under the facts, unless, at the time of the accident, he was within the scope of his employment and working under a contract *made* in this State. We have again carefully examined this record and have reached the conclusion that we cannot say, as a matter of law, that a *new contract* was made with deceased when he was called to St. Louis in 1931, or to state it otherwise, our conclusion is that there was substantial evidence to support the finding of the commission that a new contract was not made when deceased was called to St. Louis.

The judgment of the circuit court should be reversed and it is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.