Nora Rendleman, Appellant, v. East Texas Motor Freight Lines and Hartford Accident & Indemnity Company, a Corporation. —No. 39755.—196 S. W. (2d) 171.

Division Two, July 8, 1946.

Rehearing Denied, September 9, 1946.

*Russell J. Horsefield* and *Chelsea O. Inman* for appellant.

288

*John S. Marsalek* and *Moser, Marsalek & Dearing* for respondents.

BARRETT, C.—In this proceeding under the Workmen's Compensation Act Nora Rendleman, as the dependent mother of Clarence Klassie, made claim for the benefits, $12,390.00, accruing by reason of his accidental death on the 24th day of May 1943.. A referee found in favor of the claimant but upon appeal the full Commission found that the "accident occurred in the State of Illinois, and that the contract of employment was not entered ▮▮▮▮ into in the State of Missouri" and, therefore, compensation was denied because, in these circumstances, the Commission did not have jurisdiction to make an award. Mo. R. S. A., Sec. 3700(b). The Commission's award was affirmed by the Circuit Court and upon this appeal by the claimant the substantial issue is whether there is "sufficient competent evidence in the record to warrant the making of the award" Mo. R. S. A., Sec. 3732(4) in favor of the alleged employer and the insurer.

On the 14th day of February 1943 Clarence Klassie was nineteen years of age. His residence was with his mother in St. Louis at 5059 Cates Avenue. On that day, however, he was in Springfield, Illinois with his step-sister, Alice Paxton, and the girl to whom he was engaged, Mrs. Elizabeth Louise Kyle. Previously he had worked for a bakery in Springfield but on that day he was unemployed and desirous of a job as a truck driver.. Mrs. Paxton's husband was a truck driver and through him they were looking for a place for Clarence. On the 14th day of February a truck driver friend of the Paxtons, who drove for Plaza Express, called Mrs. Paxton in Springfield from Litchfield, Illinois and informed her that a truck driver was leaving his truck, quitting his job, at Litchfield, and that if Klassie would come over he could have the job. Clarence called his mother in St. Louis and told her that he had a job, that he was going to Chicago and would see her on the following Monday when he came to St. Louis. Mrs. Paxton and Mrs. Kyle drove Klassie to Curley's Cafe on the highway near Litchfield. There they met Raymond Archer, a truck driver, who was en route from St. Louis to Chicago with a cargo of Anheuser-Busch beer, and who was then and there quitting his job. Archer gave Klassie his "log book," the bill of lading, a trip lease, told him where to deliver the cargo in Chicago and turned the truck over to him. Klassie delivered the beer in Chicago, the truck was loaded with general freight and he delivered it to the dock of East Texas Motor Freight Lines in St. Louis. Thereafter three times a week, until he was killed on the 24th day of May 1943 in a collision with an automobile near Carlinville, Illinois, he took a cargo of Anheuser-Busch beer from St. Louis to Chicago and returned with a cargo of general freight.

Each time he left St. Louis and Chicago he signed, what several of the witnesses called, a "trip lease." It was a mimeographed form headed "East Texas Motor Freight Lines—Memorandum of Equipment Lease Agreement." In part it said: "This memorandum . . . when properly signed by the East Texas Motor Freight Lines, and by the owner of automotive equipment or his representative, will constitute an agreement covering the leasing of such equipment, . . ." The equipment was described and the terms of the "compensation to be paid the lessor for the use of the above described equipment on the single trip" were set forth. From Chicago, in the first lease signed by Klassie on the 15th of February the "total equipment rental" was $48.60, the wages of the driver $10.06. From the driver's pay of $10.06 East Texas deducted forty-two cents victory tax and ten cents old age benefits, giving him a net of $9.54. In addition, on the trips from St. Louis, Klassie was advanced from the sum due the lessor expenses for gasoline, oil and repairs, leaving as the net balance due the truck owner $15.00. Each lease was signed by a representative of East Texas Motor Freight Lines and by the

driver. The lessor did not sign the trip leases but his name was typed in the space opposite the word "lessor" and above the driver's signature. The last clause of the instrument provided that "It is further understood and agreed that while the foregoing equipment is under the direction and control of East Texas Motor Freight Lines, that it shall be operated only by the lessor or his representative while in the employ of the East Texas Motor Freight Lines." From February to May Klassie made about thirty such round trips between St. Louis and Chicago. In Chicago, from the first trip, in addition to delivering his cargo of beer, he made local "pick-up" and delivery trips, twenty-eight in number, for which he received additional sums ranging from $2.00 to $5.00. For his trips Klassie was issued thirty-three checks in Chicago and twenty-eight checks in St. Louis. The checks were all issued by East Texas, those in Chicago on a Chicago bank and those in St. Louis on a St. Louis bank.

The equipment was a 1941 Mack tractor with a 1940 Freuhauf trailer. The truck and trailer belonged to Stanley Pichen who lived at Cary, Illinois, but who worked for his father-in-law, the Anheuser-Busch distributor at Antioch, Illinois. On the door of the tractor was the name "Pichen." On the trailer were the words "Budweiser" and "Anheuser-Busch." Pichen did not have a permit to operate a truck in interstate commerce, nor, as we understand it, even a permit to operate as a motor carrier in Illinois and, therefore, could not engage in the business of hauling by motor vehicle in his own name. Consequently, his equipment had always been operated under an arrangement with some motor carrier who had the proper permits. Pichen claimed that he had signed a written general lease with East Texas, executed in Chicago, but no such lease was produced and the evidence of East Texas tends to show that there was no such written contract. The drivers, according to him, were "under the jurisdiction of the equipment at all times." He did not remember how or where he employed Archer but Archer had driven the equipment for some time, first under the permits of Plaza Express Company and later under the permits of East Texas and in the circumstances previously set forth. The driver's rate of pay was governed by a labor union contract known as the "Twelve State Agreement," and "over the road motor freight agreement covering drivers employed by private, common and contract carriers."

Archer said that in putting Klassie in charge of the truck he did not represent East Texas and had no authority from Pichen to employ anyone. He simply put Klassie in charge of the truck and told him to call Pichen when he got to Chicago. The Chicago representative of East Texas, who made whatever arrangements were made in Chicago, was in England when the claim was tried and his evidence was not available. But, when Klassie got to Chicago he reported, as Archer had directed, to East Texas and eventually called Pichen,

the truck was loaded with general freight and he returned to St. Louis with a "pink slip" from Anheuser-Busch for another cargo of beer. The first the St. Louis office of East Texas knew of Klassie was when he appeared at their dock with the cargo, told them Archer had quit and that he was taking his place. That night, as in Chicago, the truck was loaded with beer and the following day Klassie signed a trip lease and returned to Chicago.

This mere outline of the detailed evidence will suffice for the purposes of this opinion. The appellant's contention that there is not sufficient competent evidence in the record to support the award of the Commission is threefold: first, that the trip lease executed in Chicago on the 15th day of February and each trip lease thereafter constituted a separate contract of hiring applicable to that trip only and that the last trip lease, executed in St. Louis on May 24th, was the unambiguous written contract of employment for that trip and was executed in Missouri; second, that even though a contract was made in Illinois wherein Pichen became Klassie's employer, yet Klassie was "in the special employ" of East Texas by virtue of the trip lease executed in St. Louis; and, third, there was no evidence that he was employed in Illinois.

But, the Commission's finding and award in favor of the respondents is "upon the whole evidence." Doughton v. Marland Refining Co., 331 Mo. 280, 289, 53 S. W. (2d) 236, 240. Of course, if there is "not sufficient competent evidence in the record to warrant the making of the award" Mo. R. S. A., Sec. 3732(4) or, to put it another way, if there is no evidence to support the finding of fact made by the Commission, then the fact found does not support the award and the Commission's ruling could not stand. Sawtell v. Stern Bros. & Co., 226 Mo. App. 485, 490, 44 S. W. (2d) 264, 267. The Commission's finding, however, absent fraud, is conclusive upon appeal if supported by sufficient competent evidence. Mo. R. S. A., Sec. 3732. And, in passing upon the sufficiency of the evidence it must be kept in mind that we view the record in the light most favorable to the finding and disregard any evidence which might support a different finding than the one the Commission made. Adams v. Continental Life Ins. Co., 340 Mo. 417, 424, 101 S. W. (2d) 75, 77. The question, where the contract or arrangement was made, is one of fact (Kelsall v. Riss & Co. (Mo. App.), 165 S. W. (2d) 329) and the burden of sustaining the fact, both as to proof and persuasion is upon the claimant. Smith v. Braudis Coal Co., 234 Mo. App. 1237, 1240, 123 S. W. (2d) 223.

With these generally accepted fundamentals in mind it may be assumed, for the sake of argument, that there is evidence from which the Commission could have found that Klassie was in the general employ of Pichen under a contract made with him in Illinois and in the special employ of East Texas when operating under the

trip leases on its motor carrier permits. Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S. W. (2d) 119. It may even be assumed that the Commission could have found that each of the trip leases constituted separate contracts of employment and that the last one created the relationship in Missouri. But the difficulty with the appellant's contention in this respect is that these are not the uncontradicted facts. Hassell v. C. J. Reineke Lbr. Co. (Mo. App.), 54 S. W. (2d) 758. These are not the only inferences the Commission could draw from the record and hence we may not view the record as we might had the Commission found for the claimant. Deister v. Thompson, 352 Mo. 871, 876, 180 S. W. (2d) 15, 18.

The general test of where, as a fact, the relationship (Pruitt v. Harker, 328 Mo. 1200, 43 S. W. (2d) 769) of employee and employer was created or entered into is a problem of the intention of the parties (Overcash v. Yellow Transit Co., 352 Mo. 993, 180 S. W. (2d) 678) as evidenced by their acts and conduct, the nature of the business, the situation of the parties and all the facts and circumstances. Kelsall v. Riss & Co., supra; Adams v. Continental Life Ins. Co., supra. With good reason the Commission could accept the simplest view of the matter, that when Klassie appeared at Litchfield, took charge of the equipment, the bill of lading, the log book and received Archer's instructions, though given without authority (Anschutz v. Phillips Petroleum Co. (Mo. App.), 142 S. W. (2d) 110), he then and there intended to enter into a contract of employment or establish the relationship of employer and employee as soon as possible by doing whatever was necessary at the earliest possible moment to perfect the relationship. At that point—when Klassie took charge of the equipment and evinced his intention, the relationship was not complete. 1 Williston, Contracts, Sec. 104, pp. 351-352; Daggett v. Kansas City Structural Steel Co., 334 Mo. 207, 65 S. W. (2d) 1036, 1038. But certainly, when he appeared at the dock in Chicago and his services were accepted by either Pichen or East Texas, or both of them, and he was sent to make "pick-ups" and deliveries, paid for his work and started out on a return trip to St. Louis, the relationship was entered into or established. Deister v. Thompson, supra; Hunt v. Jeffries (Mo. App.), 156 S. W. (2d) 23. It was then and there that the last act necessary to the creation or establishment of the relationship occurred. 1 Williston, Contracts, Sec. 97, p. 309.

While it is arguable that the trip leases are indicative of separate contracts it is just as likely that they were used for the purpose of complying with the requirements of the laws relating to motor carriers and the labor union contract. From the conduct of the parties, after Klassie's appearance in Chicago, it is a reasonable inference that steady employment or one relationship from thenceforward was contemplated and their mutual assent was then and there

made manifest. Sims v. Truscon Steel Co., 343 Mo. 1216, 126 S. W. (2d) 204; Towers v. Watson Bros. Trans. Co., 229 Iowa, 387, 392, 294 N. W. 591. The performance of some other or further act in St. Louis in creation of the relationship was not necessarily in contemplation or required. Adams v. Continental Life Ins. Co., supra; Deister v. Thompson, supra. This is but one illustration of what the Commission may have found but it demonstrates that there was sufficient competent evidence to support the Commission's finding and award that it did not have jurisdiction of the claim because the relationship of employer and employee had not been entered into in Missouri. Hunt v. Jeffries, supra; Anschutz v. Phillips Petroleum Co., supra.

There were other issues upon the trial of the claim; whether Mrs. Rendleman was a dependent and who, in fact was Klassie's employer, but in the view we have taken of the case these questions are only incidental and it is not intended in this opinion to in any manner decide these questions.

The judgment is affirmed. *Westhues* and *Bohling*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by Barrett, C., is adopted as the opinion of the court. All the judges concur.