ALVERA DANFORD, MARTIN R. DANFORD and JEANNE K. DANFORD, Appellants, v. REINHARDT PACKING COMPANY and CONSOLIDATED UNDERWRITERS, Respondents, No. 41952—235 S. W. (2d) 278.

Division One, January 8, 1951.

*Russell J. Horsefeld* for appellants.

590

*Earl B. Simpson* and *Luke, Cunliff & Wilson* for respondents.

[278] LOZIER, C.—Claimants-appellants, dependents of Martin Danford, deceased, appeal from a judgment affirming a ruling of the Industrial Commission denying $13,380 workmen's compensation.

Respondents are the employer company and its insurer. The commission's ruling was: "We find from the evidence that claimants failed to prove that the death of the employee resulted from an accident arising out of and in the course of his employment." Claimants assert that the ruling is not supported by competent and substantial evidence upon the whole record and is against the overwhelming weight of the evidence.

Danford was an assistant butcher at the company's "rat proof" packing plant. Twenty feet away was a company-owned residence, one room in the basement of which the employees used for changing clothes, eating lunch and relaxing. Employees hung their bloody work clothes on the walls and left their lunches on benches or the window sill. The water used at the plant and in the basement room toilet and showers was "regular city water." The residence was not "rat proof." Prior to Feb. 22, 1947, rats had been seen entering the basement and in the residence yard. Employees had observed rat feces and urine and "rat gnawings" in the basement room. Prior to Feb. 22, the paper around the lunch of Danford's foreman was "chewed off by something," and the foreman, the plant superintendent and several employees had discussed rats having access to and coming into the room.

Two of Danford's fellow employees testified that: on Feb. 22, 1947, Danford left his lunch on a bench; at lunch time they and Danford found his lunch "torn and gnawed on," and the paper in which [279] it had been wrapped "torn and chewed"; one whole sandwich had disappeared but its wrapper was there, "torn and chewed"; a sweet roll had been "gnawed"; in and about the disturbed lunch were rat feces and evidence of "rat gnawings"; Danford broke off and threw away the gnawed portion of the roll and ate the rest. Mrs. Danford testified that Danford related this incident to her that evening.

Mrs. Danford testified that: prior to Feb. 22, her husband had been in good health and had never had any medical treatment; about a week after that date she noticed he "acted tired," would lie down when he came home from work, and at night rubbed his legs and took aspirin; he was "nervous and irritable"; his "stomach was upset"; he didn't have "pep and energy and couldn't get up as fast as he usually did"; she gave him no medical care for the leg ache; he had no chills or jaundiced appearance prior to Apr. 19; he continued to work until Apr. 19, when he became violently ill, couldn't keep water or aspirin on his stomach and was too weak to walk into an adjoining room; about 10 o'clock that Saturday night, "it just all of a sudden came on him," and he "practically collapsed"; he had chills, a high fever and a headache; his legs and back bothered him; his eyes were bloodshot; Dr. William A. Smith called on April

21, took a urine specimen and, the next day, gave him a thorough examination and recommended aspirin; the following day Dr. Smith gave him sulpha, but Danford vomited it up; he turned yellow and was very sick that night; the next day after that, Dr. Smith took him to the hospital; she visited him there; the jaundice began to show Thursday morning; he had one convulsion, and was in a coma the last two days.

Mrs. Danford further testified that: she prepared Danford's Feb. 22 lunch; she wrapped the items separately in waxed paper; there were two sandwiches and a sweet roll; there were no liquids; she and the children ate the 5 other rolls of the 6 she bought; she always took the meats from the refrigerator and always washed the fruits; she had never seen rats or any evidence of their presence in the home; so far as she knew, since their marriage in 1940, Danford had never had any contact with rats, had never worked or been around sewers, streams or pools of water; he didn't go hunting, fishing or swimming; the rites of his church did not include the use of holy water; they didn't own a car; he used the busses and streetcars; so far as she knew, he made no stops going to and from work; and, so far as she knew, he had never been bitten by a rat.

On the occasion of Dr. Smith's first call, Apr. 19, Danford told him that he had previously had body aches, had vomited once, had felt ill at work and had had a chill. Dr. Smith could not state that Danford had placed the time or times of these occurrences definitely with relation to his prostration that particular night. The hospital admission record, a part of claimants' case, showed that Danford gave this case history: "previous good health outside of mild 'stomach trouble' for several years; * * * denies contact with rats; denies ever having jaundice before; RUQ abdominal pains; denies seeing any serum in any manner in last 6-8 months; denies itching of skin; patient declares 6 days ago he developed general malaise and generalized aches followed soon by fever and chills; took 10 gr. aspirin in 3 hours and developed nausea and vomiting; about 4 days ago took sulfadiazene." The hospital record contained this notation: "Yesterday patient developed jaundice and nausea, vomiting and anorexia became more severe."

On Monday, Apr. 21, Dr. Arthur E. Strauss asked Mrs. Danford if her husband had ever been bitten by a rat. She gave a negative answer. She later recalled the Feb. 22 incident and related it to Dr. Strauss who asked her "to investigate of a more recent episode."

Drs. Smith, Strauss and Samuel Gray testified for claimants substantially as follows: Danford died on Apr. 29, 1947; an autopsy established Weil's disease as the cause of death; the malady is rare in this [280] country although they felt that mild or unrecognized cases are more prevalent than previously believed; it is a spirochetal disease that gets into the human blood stream through contact of

lacerated skin with infected items or through the stomach from consumption of infected food or water; while certain other animals are known or suspected carriers, the commonest known transmission agents are infected rats; generally, humans are either infected directly, from the infected rodent's bite, or indirectly by contact with food or water contaminated by an infected rat's feces or urine; instances of the latter are infection by contact with sewer water, stagnant water or holy water contaminated by a carrier rat's feces or urine; about 10% of all rats are infected and contact with the other 90% does not transmit the disease; Danford's sudden, violent prostration and shock, muscle aches, chills, fever and vomiting on Apr. 19, together with the subsequent signs of jaundice and extreme toxicity, were characteristics of the disease.

The opinions of the three doctors upon certain phases may be summarized thus: (1) incubation period in humans—no fixed time but "general concensus," 6 to 12 days, 5 to 13 days, 2 to 19 days, "rarely up to 19 days," the average being 5 to 13 days; (2) as to suddenness of initial attack—"usual way," "ordinarily comes suddenly" with complete prostration; (3) as to signs of jaundice—"as a rule within first two weeks," "usually 6 to 9 days," "a week or two"; (4) as to mild cases—"may smoulder," "symptoms may be minor (so mild as to be 'grippy')", " patient may recover or may develop into a severe case," "25 to 30% show relapse"; (5) as to other matters—no fixed time between infection and death; spirochete gets in blood system within 2 or 3 days; sets up high fever; for about 2 weeks after infection, the spirochete incubates in the blood stream, then passes into the organs, affecting particularly the liver and kidneys, and into the urine; in one instance spirochete was found in urine 63 days after contact; in another case, patient died 4 days after contact; Danford's earlier headaches and stiffness could have been symptoms of mild case.

Dr. Strauss is an internal medicine specialist on the staffs of Jewish and Barnes Hospitals. Dr. Gray is a pathologist. Dr. Smith, apparently, is a general practitioner with years of experience. The qualifications of all three were conceded. Yet the rarity of Weil's disease required that these medical experts base their opinions primarily upon what they called "the literature." Dr. Strauss said that his "knowledge of this disease is largely through description in the literature rather than personal contact with the disease." Dr. Smith said that his "experience with positive proven Weil's disease is limited to this one case." Dr. Gray said that, in his 17 years practice, in only 4 autopsies had he found this spirochete in the organs or tissues, and that in all 4 cases, death had occurred within 10 days after contact. However, he thought that the "recent literature" indicated that the disease is perhaps more common in this country

than generally believed and that mild cases were "possibly being missed."

In the opinion of claimants' doctors, Danford became infected by eating the roll on Feb. 22. Their opinions were based upon the known fact that death was due to Weil's disease and these *express assumptions*: that the Feb. 22 rat was infected and that Danford had had no other contact with an infected rat after that date. For example: Dr. Strauss conceded that: "the only phase which might conceivably be brought into question is the fact that the duration of the illness was longer than we ordinarily see it. * * * The only doubt in my mind would lie in the fact that the average period is shorter but that doubt is modified by the statements in the literature that the incubation period is indefinite." His hypothesis "excluded any other contact with rats * * * and he assumed that the (Feb. 22) rat was infected." This, however, was "not a matter of speculation—if we know a man contracted the disease, if we know this man's food has been contaminated by rats, it's a reasonable assumption to associate the two as cause and effect. * * * We naturally assume that he got the infection through some source. * * * We have, according to the question I answered, [281] a definite contact which was the food he ate which had been despoiled by a rat and we know rats harbor this organism, and, therefore, we must assume, if there was no other contact, as the hypothetical question stated, that that was the cause of his death." Similarly, upon these same express assumptions, the three thought that Danford's post-Feb. 22, and pre-Apr. 19 symptoms of "tiredness" and "stiffness" were those of a "mild case" of Weil's disease.

Dr. Charles M. Miller, an internal medicine specialist whose qualifications were not questioned, testified for the company. With one exception, his expert testimony was in accord with that of claimants' doctors. He thought it was "highly unlikely, rather than definitely 'no'," that Danford was infected Feb. 22; that the "period of incubation was too long for this particular exposure to be the cause, in the event he was entirely well up to within 4 or 5 days, within 2 days, of his acute illness." Dr. Miller said he did not know when or where Danford became infected; that it might have been on Feb. 22 but that, in his opinion, such conclusion was mere "speculation and surmise."

(Dr. George W. Saunders also testified for the employer. Claimants have assigned error in refusal to strike his testimony as hearsay. In view of the conclusion hereinafter reached, we will disregard Dr. Saunders' testimony and need not rule this assignment.)

Claimants' theory was that Danford's death was due to an infectious disease contracted by accident on Feb. 22. See Sec. 3695(b), Mo. RS 1939. They concede that they had the burden of "defi-

nitely establishing the contact and that the contact was the cause of death." But, they insist, they met that burden.

In other words, ignoring the rule requiring us to view the evidence in the light most favorable to the party successful below, claimants argue that the evidence would have justified the commission in awarding compensation. Probably so. But we are not required to rule the adequacy of the evidence to establish *claimants' case*. That is not the issue here. As in Karch v. Empire Dist. Electric Co., 358 Mo. 1062, 218 SW 2d 765: "The commission rejected the inference which respondents (claimants) would draw from the evidence and drew a contrary inference. On the evidence presented, the inference to be drawn as to the ultimate fact was for the trier of the fact."

See also: Doughton v. Marland Refining Co., 331 Mo. 280, 53 SW 2d 236; Wills v. Berberich's Delivery Co., 345 Mo. 616, 134 SW 2d 125; Rendleman v. E. Texas Motor Frt. Lines, 355 Mo. 287, 196 SW 2d 171; Seabaugh's Dependents v. Garver Lmbr. Mfg. Co., 355 Mo. 1153, 200 SW 2d 55; and Sanderson v. Producers Comm. Assn., 360 Mo. 571, 229 SW 2d 563.

We agree with the commission's finding that claimants failed to prove their case. Their burden was that Danford's Feb. 22 lunch was despoiled by an infected rat and that he was then infected with a "mild case" of Weil's disease which suddenly and violently became a "severe case" on Apr. 19. Danford undoubtedly died of Weil's disease. Assuming but not deciding that the Feb. 22 incident was an accident arising out of employment, it was incumbent upon claimants to prove that the Feb. 22 incident was the cause of Danford's death. Substantially, the commission's ruling was that claimants failed to prove the causal connection between the two.

Claimants' own case contained a series of permissible conclusions or inferences adverse to their claim. In this opinion, we shall treat these conclusions as factual inferences having probative force and not as "speculations." See Wills v. Berberich's Delivery Co., supra.

Claimants proved the Feb. 22 lunch despoliation, but did not (and obviously could not) prove that that rat was infected. But if it is a reasonable inference that it was infected, it is also a reasonable inference that it was not. As claimants' doctors said, "mild cases" are known, it is a reasonable inference that Danford contracted such a case on Feb. 22. On the other hand, these [282] doctors agreed that *generally* the "onset" is sudden and violent and *usually* occurs within a few weeks after infection; and that Danford's pre-Apr. 19 "illness" could have been "general malaise" and that its symptoms were also symptoms of other diseases, including common colds. Thus, most logically, the contrary inference may be drawn that Danford was not infected with a mild case on Feb. 22.

Similarly, Mrs. Danford's testimony would justify the inference that Danford had no other contact with an infected rat. However, as much of her testimony was qualified by "so far as I know" when he was not at home; and as Danford's fellow employees testified as to the possibilities of other contacts with rats; and as claimants' medical evidence tended to show that a rat contact more recent than that of Feb. 22 was indicated, the commission would have been justified in concluding that Danford had had contact with an infected rat other than on Feb. 22.

Thus the commission was required to choose between these conflicting permissible inferences drawable from claimants' own evidence: (1) that the Feb. 22 rat was infected *or* that it was not; (2) that Danford contracted a mild case on Feb. 22 *or* that he did not; and (3) that he was infected on that date *or* that he was thereafter infected by contact with an infected rat.

We also note that claimants' evidence as to Danford's statements concerning his ailments prior to Apr. 19 was conflicting. His statements to Dr. Smith on Apr. 19, and at the hospital on Apr. 25 tended to show post-Feb. 22 symptoms of general malaise, common cold or grippe. Conversely, when he made these statements, he may have been irrational, due to his toxic condition.

We have set out at length these various permissible alternate inferences and conclusions for the purpose of showing that the commission's ruling is sustained by claimants' own evidence. The ruling is further supported "upon the entire record." Dr. Miller, for the reasons summarized above, stated that "it was highly unlikely" that Danford was infected on Feb. 22. This was substantial evidence. Wills v. Berberich's Delivery Co., supra.

The cases cited by claimants do not support their contention that the commission's ruling was against the overwhelming weight of the evidence. For example, in the following cases, accidental injury arising out of employment was clearly established: Wood v. Wagner Electric Corp., 355 Mo. 670, 197 SW 2d 647; Smith v. Natl. Lead Co., (Mo. App.) 228 SW 2d 407; Schulz v. Great Atl. & Pac. Tea Co., 331 Mo. 616, 56 SW 2d 126; Rinehart v. F. M. Stamper Co., 227 Mo. App. 653, 55 SW 2d 729; and Cheek v. Durasteel Co., (Mo. App.) 209 SW 2d 548 (wherein there "was no substantial evidence to the contrary").

And, as in the instant case, the evidence in the following cases showed "two causes for one of which, but not the other," liability existed, or was susceptible to permissible alternate factual conclusions: Seabaugh's Dependents v. Garver Lmbr. Mfg. Co., Wills v. Berberich's Delivery Co., and Karch v. Empire Dist. Electric Co., supra.

In Sanderson v. Producers Comm. Assn., supra, "there was no factual foundation for a reasonable inference to the contrary."

Similarly, in Finerson v. Century Elec. Co., (Mo.) 227 SW 2d 740, only one factual inference was possible. See also Miller v. Ralston Purina Co., 341 Mo. 811, 109 SW 2d 866, which should be compared to the instant case. Here the evidence justifies an inference favorable to claimants which could not reasonably have been drawn in the Miller case.

In Pfister & Vogel Leather Co. v. Industrial Commission, 194 Wis. 131, 215 NW 815, an award by the trier of fact was upheld upon what the court deemed "preponderating" factual inferences favorable to the employee. There is no such preponderance in the instant case. And in Raeburn v. Lochgelly Iron and Coal Co., S. C. 21 (Court of Sessions, House of Lords, 1927), a ruling of the arbitrator (trier of fact) that deceased contracted *Weil's disease* from an infected rat in a rat-infested [283] mine was approved. That ruling, favorable to claimant, is the opposite of the ruling made by the trier of fact in the instant case.

We hold that, upon the entire record, the commission's ruling denying compensation is supported by competent and substantial evidence, and is not against the overwhelming weight of the evidence. Accordingly, the judgment of the circuit court is affirmed. *Van Osdol* and *Aschemeyer, CC.,* concur.

PER CURIAM:—The foregoing opinion by Lozier, C., is adopted as the opinion of the court. All the judges concur.