RUTH M. MILLER v. RALSTON PURINA COMPANY, Employer, and LIB-
ERTY MUTUAL INSURANCE COMPANY, Insurer, Appellants.—109
S. W. (2d) 866.

Division One, November 10, 1937.

*Woodward & Evans* for appellants.

*Harry E. Wiehe* and *Robert L. Ailworth* for respondent.

BRADLEY, C.—This cause. is under the Workmen's Compensation Law. Claimant is the widow of Charles H. Miller, deceased, who was at the time of his death, in the employ of the Ralston Purina Company. It is conceded that both the employer and employee were under the Compensation Law, and that claimant is a dependent.

It is alleged in the claim for compensation that on March 10, 1934, the employee "was engaged in demonstrating and selling animal feed in establishments where animals and birds, including parrots and parakeets, were offered for sale," and that "while so employed and in the performance of his duty and employment, he came in contact with or proximity to a parrot or parakeet or lovebirds infected with psittacosis or parrot fever, and said employee thereby became accidentally injured and infected with said disease, suffering therefrom, pain and violent injury to his lungs and body, causing his death."

The employer and insurer answered jointly, denying "that the death of Charles Miller was the result of an accident arising out of and in the course of his employment with named employer. It is further denied that there was any connection between death of the employee and his employment."

On a hearing before a referee the finding was against claimant. The referee found that the death of the employee "was not caused by an accident arising out of and in the course of his employment; hence the commission is without authority to award compensation or death benefit." On review before the full commission, the finding of the referee was affirmed, the full commission finding that the death of the employee "was not the result of an accident as defined in paragraph (b) of Section 3305, R. S. Mo. 1929, nor did he suffer an 'injury' as defined in said section. Viewing the evidence in the most favorable light for the dependents, it could only be said that employee contracted a contagious disease during the course of his employment, and such diseases are specifically excluded from the law by Section 3305."

Plaintiff appealed to the circuit court (of St. Louis), where the finding of the commission was reversed and the cause remanded to the commission "with instructions to enter a finding and award to the dependent in accordance with this decree and opinion." The employer and insurer appealed from the finding and judgment of

the trial court. It appears. that more than $9000 compensation is in dispute, hence jurisdiction of the appeal is in this court.

Claimant's case is based on the contention that the employee died of psittacosis and that he contracted this disease in Detroit, Michigan, in the course of his employment, and that the disease of psittacosis is not excluded under subdivision (b) of Section 3305, Revised Statutes 1929, as amended, Laws 1931, page 382 (Mo. Stat. Ann., sec. 3305, p. 8238). On the other hand, the employer and insurer contend that there is no substantial evidence in the record to support a finding that the deceased employee contracted psittacosis in the course of his employment, and that the disease of psittacosis is excluded by said subdivision (b) of Section 3305. That is, that injury or death resulting from psittacosis is not compensable.

The record discloses that deceased was in the employ of the Ralston Purina Company as a sales agent and resided in St. Louis. His work consisted mainly in visiting large department stores in different parts of the country and conducting in these stores special demonstration sales of dog chow and certain sanitary dog products manufactured by his employer. In March, 1934, he was directed to go to Detroit, Michigan, and put on sales demonstrations at two Sears-Roebuck stores and at the J. L. Hudson Company store. Beginning on March 8th, he was at the pet shop of the Gratiot Street store of Sears-Roebuck in Detroit for three days; and then for the next three days he was at the Grand River Avenue store of Sears-Roebuck in Detroit; and then for three days at the Hudson store in Detroit. He left Detroit March 17th, and arrived at St. Louis March 18th, but left immediately for Nashville, Tennessee, and there became ill from what appeared to be a common cold, which was first felt March 22nd. By April 1st, he was quite ill and returned to St. Louis on that day and died April 4th. From a post-mortem the conducting physicians gave it as their opinion that death was caused by the disease of psittacosis.

From the evidence of experts it appears that psittacosis is a disease originating from parrots and birds of the parrot family, and is transmitted by a virus infection, and that the incubation period is from 5 to 15 days. Dr. Lawrence Thompson, witness for claimant, testified that it was not necessary to have actual contact with infected birds in order to become infected; that "the prevailing theory of the mode of infection, or the connection between birds and humans —it. has been demonstrated that the virus is present in the nasal discharge from the bird and also in the feces and will remain virable for some time, and it is usually accepted that it is the dust emanating from the cage as the bird moves around, which is inhaled by an individual—transmission occurring that way.

"Q. Doctor, need a bird capable of transmitting this infection be actually diseased at the time, or show evidence of disease? A.

No, it has been very definitely established again and again that many birds may have had the disease in a mild form and still have the virus in their feces and not appear ill at the time.

"Q. This disease does create an immunity in the bird? A. Yes, all experimental work indicates one attack produces immunity; the definite length has not been determined. Q. Those birds then become carriers? A. Yes.

"Q. Is the disease highly communicable? A. On that there are conflicting facts. There are some things we do not understand. These conclusions are or have been reached in all laboratories where psittacosis have been worked with; that is, that all of the individuals who have come in contact with birds do not show a higher incidence, whereas even people on the floor below where birds are kept have contracted the disease from birds being kept on the floor above. The thing that is difficult to explain, as Armstrong has pointed out, is that the incidence is not greater among employees of pet shops. The explanation has been suggested that they have contracted this in a mild form, it has been mistaken for a mild cold, and they have become immune.

"Q. They become immune, workers around these pet shops, and others who come in contact with, get the disease? A. Yes. Q. And the disease may be contracted by persons who are on an entirely different floor from where the birds are and never had any actual contact? A. That has been recorded.

"Q. Doctor, what is the history of this disease, so far as its being communicated from person to person? A. It is not—there are many instances where the disease has occurred in a number of different individuals in one family. In the vast majority, however, the onset has been within two or three days of each other, suggesting a possibility of common source rather than a direct contact from individual to individual. With the presence of the virus in the nasal secretion and the lung secretion, and the rather typical picture that the amount of sputum raised is relatively small—— Q. Isn't the history of these cases, that many cases have occurred without any contact? A. In contracting the disease in families and in hospitals, studying those cases would lead one to believe that the direct contact from one human to another human by mouth secretions rarely happens. Q. Is there any evidence, when it does transmit from person to person, it is then a mixed or very light infection? A. That has been suggested. On the other hand, it has been suggested that the varying severity in different cases depends on a mixture of the psittacosis infection with other organisms which may have been on that patient's mucous membrance at the time. Q. Is it or is it not, so far as the history of the disease is recorded and as far as you know, is it not a very difficult thing to transmit this disease from

person to person requiring the very closest contact? A. Well, of course, that has never been done experimentally with humans. Q. It has been with monkeys that have been able to transmit the disease from monkey to monkey by contact? A. My own opinion would be, knowing where the organism is, in the nasal and mouth secretions, that expiring air immediately coming out of the patient's nose or mouth or actually kissing the patient or direct contact of that sort between mucous membranes would be essential."

With the above background in view, we now attend the question: Is there substantial evidence that deceased became infected with the psittacosis virus in Detroit, Michigan, while in the course of his employment? As stated, he first was in the Gratiot Street Sears-Roebuck store for three days. Claimant states in her brief that "while in the performance of his duties in the Gratiot Street store pet shop he (deceased) came in contact with and close proximity to lovebirds (parrots and parakeets) apparently infected with psittacosis, or parrot fever, and said employee thereby became accidentally injured and infected with said disease."

In the Sears-Roebuck Gratiot Street store where deceased demonstrated and sold his wares, there were parakeets, and deceased was about the cages in which these birds were. That is, giving claimant the most favorable inferences from the evidence, it may be said that deceased was about these birds. And under the most favorable evidence it may be said that such was the case at the Hudson store. There was no evidence of such birds being at the Sears-Roebuck Grand River Avenue store. But there was no evidence that any person or bird at either of these stores was infected with psittacosis, or was a carrier of such disease. There is no claim that deceased became infected with the psittacosis virus at any place, except at one of these stores in Detroit. To hold that deceased became infected at one of these stores while about these birds and the employees working in the pet shops where these birds were, would be to *presume* that some bird or birds or some one or more of the employees had psittacosis or was a carrier of this disease. Claimant endeavored to make this proof, but as stated, there is no evidence to such effect. In this situation we are compelled to hold that there is no substantial evidence that deceased became infected with the psittacosis virus in either of the pet shops in Detroit.

The burden is on a claimant to show that the accident relied on arose out of and in the course of the employment. [Reed v. Sensenbaugh, 229 Mo. App. 883, 86 S. W. (2d) 388; Hebbeler v. St. Louis Pub. Service Co. (Mo. App.), 72 S. W. (2d) 130.] And the burden of proof rule applied to the present case means that the burden was on claimant to show that deceased became infected with the psittacosis virus in one of the Detroit stores where he put on demonstrations and sales. Manifestly, an issue on the question of whether

deceased became so infected at one of these stores could not be made, absent proof that some bird or person at one of these Detroit pet shops was suffering from psittacosis or was a carrier. In Lanahan et al. v. Hydraulic-Press Brick Co. (Mo. App.), 55 S. W. (2d) 327, claimant was hard put in making proof of how and where the employee was injured, and only made connection (as we read the case) by hearsay evidence, which was not objected to. And hearsay, if not objected to, will be considered in reaching a conclusion. [Lanahan v. Hydraulic-Press Brick Co., supra; Herrin v. Stroh Bros. Delivery Co. (Mo. App.), 263 S. W. 871, l. c. 875, and cases there cited.] But in the present case, there was no evidence of any kind or any circumstance tending to show that there were any birds or persons at the pet shops in Detroit, where deceased worked, suffering from psittacosis or was a carrier. There was substantial evidence that deceased was infected with the psittacosis *somewhere,* but, as stated, a holding that he was infected in one of the Detroit pet shops would be based wholly on presumption. As we view the record, the situation of proof is identical in principle with the point in State ex rel. Mo. Pub. Utilities Co. v. Cox et al., 298 Mo. 427, 250 S. W. 551. That was a negligence case under the *res ipsa loquitur* doctrine. It was alleged that the death of Fred H. Book was caused by the negligence of the Utility Company in permitting its electricity to escape from its wires on the farm upon which deceased was employed. The company had transformers on the farm, and the wires to these carried 23,000 volts. The company furnished power for a pump on this farm, and carried the electricity on poles to within twenty-five or thirty feet of the pumphouse, where the wires were brought down to three transformers on the ground. The wires from the transformers were enclosed by a picket fence seven feet high and without gate or opening, and the wires leading down to the transformers were brought down into the pen from a pole in such a manner that in order to come in contact with them a person would have to lean through and take hold of the wire from the outside, they being brought down on top of the transformers which was in the center of the picket pen. The wires leading from the transformers to the pumphouse were carried at a reasonably safe distance above the head. The deceased's duties were to work on the farm and to go to the pumphouse and switch on and off the electricity. He was in no way connected with the utility company. "His duties necessarily led him to and from this pump and by this picket fence pen within which the transformers were located." The pen was thirteen feet north and south and twelve feet and four inches east and west. There was evidence that leading down from a pole a short distance east of the pen was a guy wire which came down between two high powered wires, and this guy wire was anchored in the ground. There was evidence that this guy wire was so slack

that it could be blown by the wind into contact with the highly charged wires between which it came down. When deceased was found dead, his feet were about eighteen inches from the north line of the picket fence, near the northwest corner. Near his right hand was a piece of wire three or four feet in length and covered with some sort of insulation. Also, there was another piece of wire nearby. There was evidence on the body tending to show that death resulted from electrocution. The guy wire mentioned was about nine feet from the place where the body was found. There was evidence that shortly after the death of deceased a horse, while grazing was seen to walk under this guy wire and receive a shock.

On these facts, the Springfield Court of Appeals (242 S. W. 433) held that a case was made for the jury under the *res ipsa loquitur* rule. Certiorari was granted and the opinion was quashed on the ground, among others mentioned, that it was "founded on mere conjecture." The gist of this court's ruling is well reflected in headnote 3 (250 S. W. 551) as follows: "Where a deceased was found lying dead directly under a high-tension electric wire, which would be from five and one-half to six feet above his head if he were standing erect, and near a guy wire which, if swung by the wind, might come into contact with live wires, liability could not be predicated upon a presumption that deceased touched the guy wire, which was pushed or blown into contact with the high-tensioned wires, since to do so would be to base one presumption upon another so as to permit a recovery."

And so in the present case, a holding that the employee became infected with the psittacosis virus in one of the pet shops in Detroit would be "founded on mere conjecture."

Claimant urges here that the commission found that deceased became infected with the psittacosis virus at one of the pet shops in Detroit where he worked, and denied compensation only on the theory that injury or death to an employee, resulting from the disease of psittacosis, is excluded under Section 3305.

The commission did not find so specifically as claimant says, but there is in the finding of the commission support for claimant's contention. As appears, supra, the commission said this: "Viewing the evidence in the most favorable light for the dependents, *it could only be said* that employee contracted a contagious disease during the course of his employment, and such diseases are specifically excluded from the law by Section 3305." (Italics ours.) If, by the language used, the commission meant to find that deceased became infected with the virus of psittacosis while working in one of the pet shops in Detroit, then such finding is based upon pure speculation and conjecture.

Section 3305, Revised Statutes 1929, as amended, Laws 1931, page 382 (Mo. Stat. Ann., sec. 3305, p. 8238), among other things,

provides that "the term 'injury' and 'personal injuries' shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom. The said terms shall in no case except as herein provided be construed to include occupational disease in any form, nor shall they be construed to include any contagious or infectious disease contracted during the course of the employment. . . ." It is urged by the employer and insurer in the present case that compensation for injury or death of an employee from the disease of psittacosis, acquired in the course of employment, is excluded under Section 3305. But in view of our conclusion above, it is not necessary to rule this question.

The judgment of the circuit court should be reversed and it is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.*, absent.