ELSIE KARCH (nee SLEDGE) and LEE RETTA JANE SLEDGE, Dependents of CECIL P. SLEDGE, Deceased, (Claimants) Respondents, v. THE EMPIRE DISTRICT ELECTRIC COMPANY, Employer and Self-Insurer, (Defendant) Appellant.—No. 40959.—218 S. W. (2d) 765.

Division One, March 14, 1949.

*Ralph Baird* and *Richard K. McPherson* for (defendant) appellant.

*Jo B. Gardner* for (claimants) respondents.

[766] DALTON, C.—This is an appeal by the employer and self-insurer from a judgment of the circuit court of Lawrence county. The judgment reversed a final award of the Industrial Commission which had denied compensation (death benefits) to claimants who are the widow and fourteen year old daughter of the deceased employee, Cecil P. Sledge. The circuit court found that the award of the Commission was contrary to the overwhelming weight of the evidence; and that, upon the whole record, the findings and award of the Commission were not supported by competent and substantial evidence. The cause was remanded to the Commission with directions to make and enter an award in favor of claimants.

The amount involved ($10,800.00) gives this court jurisdiction. Sec. 3, Art. V, Const. of Missouri 1945. The average weekly wage of the employee upon which benefits would be figured was admitted to be $54.00. Sec. 3709 R. S. 1939, as amended Laws 1943, pp. 1073 and 1076; Shroyer v. Missouri Livestock Commission Co., 332 Mo. 1219, 61 S. W. (2d) 713, 715.

The claim was based upon an alleged accidental injury, towit, a tick bite under the right arm, suffered on July 23, 1945, near Aurora, Missouri, and resulting in death on July 24, 1945. Claimants alleged that the deceased employee was a lineman for appellant and was engaged in digging holes, climbing and setting poles and trimming trees; that his work required him to be in tick-infested areas; and that, as a result of an accident arising out of and in the course of his employment, he was bitten by a tick on July 23, 1945 and died on July 24, 1945, "from coronary thrombosis as a result of such tick bite or bites." The testimony of certain witnesses was heard by Honorable Francis M. Kinder, Referee. Thereafter, a transcript of the testimony of these witnesses was offered at a hearing before Honorable Carl F. Wymore, Referee, and the testimony of other witnesses was heard and an award of no compensation was entered. Most of the widow's testimony was reviewed orally before this Referee and all of the medical testimony was heard before him. The Referee found

"from all the evidence that the death of Cecil P. Sledge, employee herein, was not the result of an accident arising out of and in the course of his employment on or about July 23, 1945, as alleged." On review before the full Commission, findings in substantially the same words were entered and a final award made denying compensation.

Appellant contends that the findings and award were supported by competent and substantial evidence upon the whole record; that such findings and award were not contrary to the overwhelming weight of the evidence; and that the circuit court erred in reversing the award of the Commission. A rather detailed review of the evidence is required.

The testimony of claimants' witnesses tended to show that the employee, hereinafter referred to as the deceased, had been in appellant's employment for some six weeks prior to his death. He resided on a farm located about nine miles southeast of Aurora and, each day, drove his own automobile to and from appellant's headquarters at Aurora. From Aurora the employees were taken to and from their work in the employer's truck. The regular period of work was eight hours, with occasional overtime. Claimant (widow) testified that deceased's health was very good and that he worked every day. His foreman testified that "he seemed to be in fair condition."

On Saturday, July 21, 1945, the deceased and other employees were engaged in building an extension line about seven miles east of Aurora, digging holes, setting poles and stringing wire along an east-west public road from the Garner farm to the Marks farm. Deceased topped two walnut trees, trimmed some soft maples and dug two post holes near Garner's house. The holes were dug in the fence row, adjacent to pasture land, which had grown up in grass and weeds. Some ten head of cattle used in this pasture, grazed to the fence and waded in and stayed about a pond, which was located about 150 feet from the road. The [767] fence row was "grown up" with "more or less sagebrush" and some blackberry bushes. The employees took their lunches and usually sat down in a fence row to eat, but where they ate on this day does not appear. What particular kind of work deceased had been doing prior to this date, and where he had been working, does not appear from the evidence.

The deceased was at home Saturday night and Sunday (July 21st and 22nd). (There was, however, testimony that he was seen Saturday pumping up his truck tires at a little country store near where he lived). He woke up Sunday morning with a severe headache, he seemed to be exhausted and he ached all over. The aches extended across his forehead, down the back of his neck and in his arms and legs. He was sick, stayed in bed most of the day (Sunday) and didn't want to do anything except lie around. He only left the house to go to the toilet, which was located a short distance away. When he went to work on Monday (23rd), he was still sick and complained of

headache. That day he worked in the southwestern edge of Clever, near the Tampa King place, building a line down the west side of a country road, right next to the fence. The fence row adjoined pasture land and there were calves in the field. There was some underbrush, a few saplings, trees and sagebrush and "stuff like that" in this fence row. It was a hot day, the men got in the shade of a big wild cherry tree, just south of where Sledge was working, and wiped sweat and talked awhile. They also sat down and ate lunch in the shade of a tree. Deceased only went into the brush while he was on duty.

Deceased had reported for work at 8 a. m., he took 30 minutes off for lunch and quit work at 4:00 p. m. It took about 30 minutes thereafter to gather up the tools and return to headquarters in Aurora. He reached home that evening (23rd), about 6:30. As soon as he stepped in his home, he complained of pain under his right arm. His wife looked and found a tick embedded on the muscle in front of and near the armpit. Its head was so buried in the flesh that it was difficult to remove. The skin about the tick was getting red and "seemed warm," "felt so hot." She "turned an alcohol bottle up over the tick" for a few seconds and pulled the tick off, being certain to get its head. Later, she treated the wound with alcohol and applied iodine. The tick was dark, with a silver spot on its back. It was further identified as the common wood tick of that district, also known as the lone star tick or dermacentor andersoni. It was about one-third larger than the ordinary female tick. Mrs. Sledge put it on a paper and cracked it with a hammer against the stove. A blood spot showed on the paper where the tick had been crushed. Deceased did not rest much that night, his arm hurt him and he kept holding up his arm. The next morning (Tuesday), the place about where the tick had been removed was swollen out some distance. It was redder than the night before and deceased complained that his arm was hurting.

Deceased didn't do any of the chores about the farm after he began working for appellant. Within a week or such matter before his death, the deceased was usually "so tired he didn't do anything, only clean up," after he came home from work in the evening. After he had stripped off his clothes and had had a bath, his wife was in the habit of checking him over for ticks. "They were a usual thing around his belt" and around his boot tops. She found a lot of them. They were usually embedded, biting, not crawling, and some "had eaten in so badly" that they were hard to remove. She had checked him over every night, except Saturday night, but could not remember going over him on that night. Deceased's body was very hairy and claimant (widow) admitted that "he might have had" a tick on him five or six days, or even longer.

When deceased reached headquarters in Aurora on Tuesday moning (24th), about 8 a. m., he showed his foreman where the tick had

been removed. He didn't work that day, but drove his own car to the hospital, where he died at 4:25 p. m. The death certificate by the attending physician showed: "Immediate cause of death Coronary Thrombosis. Duration 20 minutes. Due to: Cellulitis rt axilla. Due to: (Tick [768] bite Infection nature not determined). Duration 3 day. . . . R. D. Cowan, M. D."

With reference to ticks, the testimony tended to show that they were found everywhere in the territory around Aurora, in the grass, on flowers and trees, in lawns and on all kinds of growth, on birds and dogs and mammals of all kinds, especially cattle. Ticks were found "generally every summer," but they were worse in the summer of 1945 than usual. Most ticks were found "where stock used." Brush, leaves and shrubs in fence rows were said to be "a paradise" for ticks. Town folks didn't have as many ticks as country folks, but any area was tick-infested in 1945. They were general throughout town and country. You could go out on your lawn and sit down and get them.

Mr. Garner, the owner of the land adjacent to where deceased worked on Saturday (21st), testified that he got ticks on him on his place in the summer of 1945, "got ticks off of me, off and on, all summer long . . . plenty of them got on me all right; plenty of them on my cattle." They got on him along fence rows and in the pastures where the stock used. He found ticks and chiggers more numerous in the fence rows when picking blackberries. He got ticks off the cattle that used in the pasture and watered at the pond adjacent to where deceased worked on Saturday. Ticks were worse in some places than in others. In the woods south of Garner's there were plenty of ticks in July 1945. One witness, after hunting there with a dog, found ticks crawling around on the screen doors at his home for two days.

On the 120 acre farm, where deceased lived, he had 19 cows, 20 head of sheep, a team and a dog. He worked about the place when he felt like it. He went out to look over the place once in a while, but did not handle the sheep, cattle or team during the week preceding his death. He didn't go out over the place on Saturday, Sunday or Monday (21st-23rd). He parked his automobile in his yard and there was a walk to the house. The distance was about 25 to 30 feet, about the same as the outdoor toilet. His wife milked two of the cows and his daughter one, but his wife hadn't seen any ticks on the cows she milked. She had seen no ticks on the dog, a Pekingese, that came in the house and didn't go in the pasture or about the cows. She sprayed the cows and washed the dog. She didn't recall finding a tick on her person all summer. She had seen ticks on their farm, but "not like the rest of them testified." Deceased could have petted the dog, if he wanted to, "as a usual thing he did, when he wasn't feeling bad."

The Sledge farm was located several miles from the Garner community, but the whole community was tick-infested, including the community where deceased lived and where Tampa King, Dave Marks and Kris Garner lived. It was the same kind of territory. There wasn't anything about the Marks-Garner community that made it more tick-infested than other areas in the community generally. The evidence further tended to show there was nothing about deceased's employment and nothing growing out of his employment which exposed him to any greater danger of tick bite than any other member of the public.

Ted Brinkley, who worked with the deceased, didn't notice any ticks where they were working, near the King place, on Monday. He didn't find a tick on himself that summer, until the evening of the 25th, the day he worked in Aurora, after deceased's death. Since the tick he found was embedded, he thought it had been on there several hours, he "would say at least it had been on there as much as six or eight hours; could be more." Fred Wilson, another member of the same crew, didn't notice any ticks Monday, when they worked near the King place. Ticks didn't bother him like some people, he only got one all summer and not on that day.

. Claimants' medical testimony tended to show that the common wood tick is a carrier of certain diseases, such as tularemia, Rocky Mountain spotted fever and tick paralysis; and that any poison that would cause an irritation of the interior of a blood vessel was apt to cause coronary thrombosis, so a tick bite could, indirectly, cause it. Coronary thrombosis was said to be a diseased condition of the arteries of the [769] heart, a stopping up of the vessel's supplying blood to the heart muscles. It was possible that the toxin or poison from a tick bite could inflame the blood vessels, as other poisons do. When a tick gets on the body, it finds a suitable place to dig in and get blood. It has to have blood in order to stay alive and complete the life cycle. It hunts blood until it gets it and, after it gets it, it mates. A tick lays its eggs in the leaves. It becomes dormant in winter and active in spring. In early stages ticks attack, mainly, small rodents, but in adult stages they attack larger animals and man. The minimum cycle is two years. On humans, ticks seek a blood supply near the surface or where clothes bind, as under a belt or garter. How soon a tick will start to dig in "is problematical," depends on many things, and "generally ranges within a half hour to four hours." The tick would have had to have been on deceased one to six days to gorge itself with blood to show an increase of one-third in size. The usual period would be one day, ten days would be unusual, but it would depend upon the rate of engorgement and whether the tick had reached the blood stream. Any germs that happened to be on the tick's body could be injected and cause infection, like an inoculated splinter carrying germs and causing "what we used to call blood

poisoning." It would not be speculative to assume that a violent infection did occur with the bite of this tick.

According to Dr. L. F. Heimburger, the tick bite in question *could have caused the death* of deceased. The circumstances "would lead one to expect that some sort of poison was injected by the tick, which *might have been responsible* for an inflammation of the coronary vessels, thereby causing death." (Italics ours). Excluding tularemia, spotted fever, tick paralysis, there would be no more danger from tick bites than other insect bites, since they are merely skin punctures. The minimum time for a streptococcus infection from tick bite would be three to four days. Infection usually results from scratching the bite under non-sterile conditions. Any infection from a skin puncture would normally take at least three or four days to reach the heart.

The employer's evidence tended to show that coronary thrombosis occurs only in people who have diseased coronary arteries. The disease is not caused by infection and, ordinarily, is of many years' duration, a slow progressive affair. Coronary thrombosis could not result from tick bite within eight or ten days. A thickening of the artery walls and a blood clot would be required. A poison would not cause a thickening of the walls and a tick bite infection would not cause a blood clot. While people die as a result of infection, the patient "doesn't die just like that, he goes on and gets progressively worse, runs a high fever." "The shortest time to develop a thrombosis big enough to cause death" would be two or three weeks. One witness testified: "I can't conceive of how any irritation of a tick bite could cause an occlusion of the coronary artery. It may cause an occlusion of the local capillary area—local capillaries around the bite, from pressure. . . . Well, there is no direct connection between the cellulitis which is caused by the tick bite, and things that cause a coronary thrombosis." Other testimony tended to show that a tick one-third larger than normal size would indicate the tick had been gorging at least five or six days, as "it takes them a long while to get filled up." Except for the peculiar infectious diseases carried by ticks, there is no practical difference between tick bites and the bites of insects, "they are just skin punctures." Infections from skin punctures rarely result in death. It is not possible to get a streptococcus infection from the tick bite.

Were the findings and award of the Commission, denying compensation, supported by competent and substantial evidence upon the whole record? In determining the issue presented we must consider whether, under all of the evidence before it, the Commission could reasonably have made the findings and reached the result mentioned. If the Commission's findings and award are supported by competent and substantial evidence upon the whole record, we may not go further and substitute our own judgment for that of the

Commission. The rule of deference, also, applies concerning the oral testimony of [770] witnesses who appeared in person before the referee, or Commission. Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S. W. (2d) 55, 62; Scott v. Wheelock Bros., 357 Mo. 480, 209 S. W. (2d) 149; Wood v. Wagner Elec. Corp., 355 Mo. 670, 197 S. W. (2d) 647, 649; Goetz v. J. D. Carson Co., 357 Mo. 125, 206 S. W. (2d) 530, 532; Sec. 3732 R. S. 1939, as modified by Sec. 22, Art. V, Const. of Missouri 1945; Administrative Review Act, Laws 1945, p. 1504, Sec. 10, Mo. R. S. A. Sec. 1140.110(f).

Respondents concede they had the burden of establishing that deceased's death was caused by tick bite and that the injury was received in the course of his employment and arose out of such employment. Miller v. Ralston Purina Co., 341 Mo. 811, 109 S. W. (2d) 866, 868; Meintz v. Arthur Morgan Trucking Co., 345 Mo. 251, 132 S. W. (2d) 1010, 1014. Respondents argue that the Commission must have acted on the theory that they had failed to meet this burden of proof. They further say that appellants offered no evidence on any of the three issues involved; and that the medical evidence offered was insufficient to raise an issue of fact that the tick bite did not cause the death. Respondents insist that the findings and award denying compensation were against the overwhelming weight of the evidence.

We need not determine whether findings favorable to claimants, and an award of compensation to them, would have been supported by competent and substantial evidence. The question is whether the findings and award, as made, are so supported. If a finding against the claimants upon any one of the essential issues necessary to an award of compensation to them was fully supported by competent and substantial evidence upon the whole record, then the final award of the Commission denying compensation must be sustained.

Respondents concede that the evidence (in support of the proposition that the tick bite was received by deceased in the course of his employment) is entirely circumstantial. They say the proof "was necessarily limited to circumstantial evidence," but that the evidence was sufficient, since it was only essential that the finding be based upon a reasonable probability. Goetz v. J. D. Carson Co., supra; Zimmerman v. Goodfellow Lumber Co. (Mo. App.), 56 S. W. (2d) 608; Reeves v. Fraser-Brace Engineering Co., 237 Mo. App. 473, 172 S. W. (2d) 274. Respondents insist that the circumstantial evidence, including the evidence of the removal of ticks from deceased's body on Friday evening (20th), shows that the tick found on deceased on Monday evening (23rd) "was under his arm on Saturday (21st) prior to his death on Tuesday"; that Dr. Heimburger's testimony shows that Saturday would have been *the latest date* when the poison could have been injected by tick bite; that the death certificate stated the illness had existed three days; that "ticks require eight days to

engorge'' and this tick, on Monday night, contained blood and was one-third larger than an unengorged tick; and that, after the removal of ticks Friday evening (20th), deceased had been no place to get ticks, except at his work. Other circumstances mentioned are that the tick was in search of a blood meal, necessary to reproduction; that the tick was an adult that had not eaten for appoximately one year; that all ticks previously found on deceased had "already bitten him"; that, on Saturday, the deceased had spent eight hours on duty in an ideal location for tick hibernation; that the only purpose of the tick in getting on the deceased was to eat; and that it is common knowledge that hungry ticks immediately eat when food is available. Accordingly, respondents contend the circumstantial evidence shows that the tick bit the deceased "while he was on duty Saturday and in so doing punctured the skin"; and that "the event of the tick bite must have occurred while deceased was on duty."

It has been said that "an injuy to an employee arises 'in the course of' his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental thereto." Wahlig v. Krenning-Schlapp Groc. Co., 325 Mo. 677, 29 S. W. (2d) 128, 130; Goetz v. J. D. Carson Co., supra; Miller v. [771] Ralston Purina Co., supra (109 S. W. (2d) 866, 868). Respondents offered no direct evidence of accident and injury in the course of employment, or as to when or where the tick got on the deceased or when it bit him. The evidence was circumstantial and did not require a finding of the ultimate fact that the skin puncture (tick bite) occurred in the period of employment, rather than at some other time. Two different conclusions or inferences could be drawn. The evidence would support a finding that the tick was on deceased prior to Saturday (21st) and that it could have gotten upon him and bitten him at his home. It was, therefore, immaterial that appellant offered no direct evidence on this issue. The Commission rejected the inference which respondents would draw from the evidence and drew a contrary inference. On the evidence presented, the inference to be drawn as to the ultimate fact was for the trier of the fact. Scott v. Wheelock Bros., supra (209 S. W. (2d) 149, 153); Ashwell v. U. S. Seed Co. (Mo. App.), 167 S. W. (2d) 950, 952; Crawford v. A. J. Sheahan Granite Co. (Mo. App.), 211 S. W. (2d) 52. Substantially the same situation exists as to whether or not the tick bite in question caused the coronary thrombosis which resulted in deceased's death. Meintz v. Arthur Morgan Trucking Co., supra (132 S. W. (2d) 1010, 1014). From a careful consideration of the whole record, we have reached the conclusion that the award of the Commission, denying compensation, is based upon competent and substantial evidence upon the whole record; and that the findings and award are not against the overwhelming weight of the evidence.

The judgment of the circuit court must be reversed and the cause remanded with directions to affirm the award of the Commission. It is so ordered. *Bradley* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.