227 S.W.2d 740 (1950)
FINERSON et al
v.
CENTURY ELECTRIC CO.
No. 41299.
Supreme Court of Missouri, Division No. 1.
March 13, 1950.
*741 John C. Casey, Max M. Librach, and Louis E. Zuckerman, St. Louis, for appellants.
Luke, Cunliff & Wilson and George A. Ryan, St. Louis, for respondent.
LOZIER, Commissioner.
This is a workmen's compensation case wherein the dependents of Phillip Finerson appeal from a judgment affirming an award of the Industrial Commission denying $11,950.00 compensation. The appeal is here because of the amount in dispute. Art. V, Sec. 3, 1945 Constitution, Mo.R.S.A. After a hearing, the referee made findings of fact and rulings of law, including a finding that Finerson's death "was the result of an accident arising out of and in the course of his employment," and awarded compensation. Upon review, the commission found that claimants had "failed to prove that the death of the employee was the result of an accident arising out of and in the course of his employment" and denied compensation. The liability of the company, a self-insurer, and the amount payable are conceded if Finerson's death was by accident arising out of and in the course of his employment. The issues are the sufficiency of the commission's finding of fact and conclusion of law and the sufficiency of the evidence upon which the commission made its award.
Claimants state that, after the award was made, they filed a motion requesting further findings of fact and rulings of law; that the commission did not act upon this motion; and that the cause *742 should be remanded with directions that the commission make further findings. This suggestion is without merit. The commission's finding was as to the ultimate constitutive fact which it was required to determine and was sufficient. Mershon v. Missouri Public Service Corp., 359 Mo. 257, 221 S.W.2d 165. Findings are not required as to evidentiary facts. State ex rel. Probst v. Haid, 333 Mo. 390, 62 S.W.2d 869; Scott v. Wheelock Bros., 357 Mo. 480, 209 S.W.2d 149; Baird v. Gleaner Harvester Corp., Mo.App., 172 S.W.2d 892. Claimants cite Smith v. General Motors Corp., Mo.Sup., 189 S.W.2d 259, in which we held that a party could not complain in the appellate court that additional findings should have been made, unless he had first requested the commission to make such findings. This ruling was subsequently restated in Scott v. Wheelock Bros., 357 Mo. 480, 209 S.W.2d 149; Evans v. Farmers Mutual Hail Ins. Co., Mo.App., 217 S.W. 2d 705; Williams v. International Shoe Co., Mo.App., 213 S.W.2d 657; and Jones v. Remington Arms Co., Mo.App., 209 S.W.2d 156. However, none of these cases hold that failure to amplify the findings made, or to make additional findings, when requested is reversible error. As the finding here was sufficient as to the ultimate constitutive fact, and as we are not informed as to what additional or amplifying findings claimants requested, we are unable to determine whether or not claimants were entitled to have the commission make such additional findings and, therefore, rule against claimants upon this issue.
For about 18 months prior to December 6, 1945, Finerson had worked at a moulding machine in the company's Market St. foundry, and on that day was one of 26 men engaged in such work. The machines were so arranged that the moulders were approximately from 12 to 40 inches apart. The operator, after making every fourth or fifth mould, sprayed the pattern with a mixture of oil, paraffin wax and stearic acid, causing wax to adhere to the pattern. The "spray gun" was a can surmounted by a horizontal tube. The moulder filled the can with the mixture, connected an air hose to the tube and released the pressured air which forced a spray of the mixture out of the tube and upon the pattern. The mixture was prepared and kept in a drum on the same floor by another employee, Robert Buckingham. Each moulder had a can or bucket which he filled from the drum and kept near his machine and from which he filled his sprayer. Sometimes moulders working at adjoining machines used the same can or bucket.
Usually Buckingham obtained the paraffin wax and stearic acid, and a drum containing coal oil, from the second floor. Sometimes, however, he obtained the drum, with its coal oil contents, from a platform outside the building on the ground floor. He attached a faucet (for use by the moulders in drawing off the mixture into their cans or buckets) in one hole, placed the drum upon a stand, poured in the wax and stearic acid and stirred the mixture with a paddle.
Some of the drums were painted and others were not. Some "had names on them" and some had tags attached. There was no evidence as to where or from whom the company acquired either the coal oil or the drums. Neither Frank Reingold, the foreman, nor Buckingham had anything to do with the purchase or acceptance of the deliveries of any materials. Each testified that he did not recall the names on those that "had names on them," or had ever read the identification marks, if there were any, on the drums. No one other than Buckingham had anything to do with obtaining the drums from either the storeroom or the platform, with obtaining the wax and stearic acid from the storeroom or with preparing the mixture.
Finerson was 26 years old and was a steady, dependable worker. His widow testified that he had been in good health and was in good health on the day and evening of December 5, 1945, and on the following morning when he left home. He had not worked December 5, and, according to his widow, had spent that day and evening with her, "doing Christmas shopping" and attending a show. Reingold, Buckingham, and moulders Page and Mastin did not recall that Finerson appeared sick or other than in good health. While working at his *743 machine in the usual way, about 10:45 or 11 a. m., December 6, Finerson suddenly fell to the floor, dead or dying.
Frank Reingold testified that he had worked at the Market St. foundry for 13 years, the last 7 as moulder foreman, and that Finerson had worked under him for about 18 months prior to December 6, 1945. Reingold stated that that morning Finerson's actions seemed normal and that he was doing his regular work in the usual manner. He did not see Finerson collapse. None of the moulders had reported sick that morning and Reingold had noticed no "sweet odors." He had never used Blacosolv (a degreasing solvent), had never seen it around the foundry and, in fact, had never heard of it.
Robert Buckingham testified that he had been preparing the mixture for over 2 years. He had never seen Blacosolv around the foundry and, like Reingold, had never heard of it. He had never "smelt a sweetish odor around there" and the mixture "smelt like coal oil" to him. He always "tested" the contents of the drums by smelling the coal oil. It does not appear whether or not the mixture used by the moulders that day was mixed that morning, but, according to Buckingham, the balance of that particular "batch" was subsequently "used up by the moulders."
Robert Page testified that he had been a moulder there for 15 years and had used the spray mixture for the last 7. That morning he was working at the machine immediately left of Finerson's and the two were filling their sprayers out of the same can or bucket. He noticed no unusual odors and the spray had the "usual coal oil smell." The other moulders were using the same mixture and Page noticed nothing unusual. He was not sick himself that day and, in the years he had been spraying patterns, had never been sick except with occasional bad colds.
Hall Mastin had been a moulder there for 6½ years prior to that day. He testified that that morning he was doing work similar to Finerson's, 25 or 30 feet away; that he had noticed a "sweetish-like" odor; that it "was strong and burned" his eyes and that his nose kept running; that it "was mighty strong that day"; that he had noticed it many times previously; that some moulders used the same can or bucket; that he had used a sprayer many times with the mixture; that the "spray fog," after hitting the pattern, flew back in his face; that he had suffered indigestion, gas pains, headaches, and nose running as results; that he continued doing the same work there until some time in January, 1946, when he quit "because of the gas"; and that he had known Finerson about 4 years, had lived near him and had associated with him away from the plant, and that Finerson "was the kind of boy that didn't run around."
While the Coroner of the City of St. Louis was investigating the cause of Finerson's death, two of the company's employees died suddenly while working at its Pine St. plant. The two plants were not used in the same kind of manufacturing operations and the work performed by Finerson and the materials handled by him were quite different from the work performed and the materials handled by the employees at the other plant. See Stamps v. Century Electric Co., Mo.App., 225 S. W.2d 493. The causes of the deaths could not be determined by the coroner. Dr. Walter J. Siebert, a St. Louis pathologist and the coroner's physician, sent parts of the lungs and kidneys and some of the blood of Finerson and the two other employees to Dr. William D. McNally, Chicago. On February 4, 1946, Dr. McNally reported to Dr. Siebert, that, in his opinion, all three employees had died as a result of "the inhalation of a chlorinated hydrocarbon." He did not specify which one of the many chlorinated hydrocarbons it was. Thereafter, claimants' attorney telephoned Dr. McNally and discussed the doctor's February 4 report relative to all three cases. Dr. McNally testified that, as a result of that conversation, he made further tests "to find out the definite chlorinated hydrocarbon in this substance, with the end result that I found tetrachloroethylene."
Dr. McNally testified, in part: That before making this February 4 report, he had made the usual tests of Finerson's lung and kidney for evidence of poisoning by *744 heavier metals, with negative results; that his initial tests of the blood indicated the presence of both .05 per cent (10 times normal) grain alcohol, and a chlorinated hydrocarbon; that, as a result of further tests of the blood and examination of slides of the lung and kidney tissues, he determined definitely that the particular chlorinated hydrocarbon was tetrachloroethylene; and that, in his opinion, Finerson's death was caused by "ingestion" rather than "inhalation" because tetrachloroethylene, with a boiling point of 120.8, was not so easily inhaled as trichloroethylene, with a boiling point of 87.
Dr. McNally stated positively that Finerson did not die of trichloroethylene poisoning and that his findings indicated that Finerson "either had a drink shortly before death or, if he had no access to alcohol at work, he had had considerable when he came to work that morning."
Complainants assert that Dr. McNally's testimony is to be believed only to the extent set out in his original report, and that his testimony that he made further tests after February 4, 1946, is "unworthy of belief" and that "his credibility on this score was utterly destroyed." Dr. McNally was a nationally recognized toxicologist and physician, was toxicologist or chemist to the Cook County coroner, had been engaged in toxicological work for over 30 years, was the author of two books and over 200 articles on toxicology, and had made over 20,000 post-mortem toxicological examinations. He was the only toxicological expert who had made an examination of Finerson's organs and blood. Such examination was made at the request of the St. Louis City coroner, not of the company, and he obviously was a disinterested witness.
Walter A. Quebedeaux testified that he was "a combined chemical engineer and chemist," but was not a physician or a toxicologist. At no time did he make any tests or any examination of Finerson's organs or blood. He testified solely as an expert chemist. He stated he would have made one additional test not made by Dr. McNally. However, he conceded that the tests made by Dr. McNally were "reasonably accurate if performed by a competent person"; that if Dr. McNally made such tests, he made them in a proper manner; and that he (Quebedeaux) "was not prepared to say that his finding was wrong."
At the request of the coroner, Robert M. Brown, a chemical engineer and Chief of the Industrial Hygiene Section, St. Louis City Health Department, made an inspection of the Market St. foundry on February 11, 1946. He found no chlorinated hydrocarbon solvents (and, specifically, no Blacosolv and no tetrachloroethylene compound) on the premises, and saw no process or operation requiring the use of any degreasing solvents. He encountered only the "usual foundry smells" and smelt no odor indicating the presence of any chlorinated hydrocarbon. He found drums of various kinds of oil, none of which contained chlorinated hydrocarbons.
Blacosolv is a trade name of a compound used for removing oil and grease from machine parts. It consists mainly of trichloroethylene. At the hearing, complainants introduced 6 invoices showing purchases of Blacosolv by the company in January, March and November, 1945. All 6 invoices show the purchaser as the "Century Electric Co., 1806 Pine St., St. Louis, Mo." Four of the 6 specifically showed that deliveries were made to the company at the Pine St. plant. The other 2 did not show the place or places of delivery, but the evidence that no Blacosolv was ever delivered at the Market St. foundry is undisputed.
The company had once operated a "shell plant" on Forest Park Blvd., close to the Market St. foundry, but this plant was closed 4 months before Finerson's death. There was no evidence that, prior to the time the Forest Park Blvd. plant was closed, Blacosolv or any other compound containing a chlorinated hydrocarbon, was ever sent to or used in that plant, or that any materials or supplies of any kind were moved from it to the Market St. foundry.
Tetrachloroethylene and trichloroethylene, both chlorinated hydrocarbons, are degreasers and are used commercially for the removal of oil and grease. Neither paraffin wax, stearic acid nor coal oil, nor a *745 combination of the three, is a chlorinated hydrocarbon.
For brevity and convenience, we herein use the terms "industrial accident" for an "accident arising out of and in the course of employment," and "industrial injury" for an injury due to such industrial accident.
Complainants contend, first: that inasmuch as the evidence showed Finerson died while at work, there is a presumption that his death resulted from an industrial accident; that the burden was on the company to rebut this presumption and that it failed to do so; and that, therefore, the commission's finding is not sustained by competent and substantial evidence. Upon the whole record, if the presumption upon which claimants rely ever arose in this case, it was rebutted by competent and substantial evidence. McCoy v. Simpson, 346 Mo. 72, 139 S.W.2d 950; Williams v. Planters Realty Co., Mo.App., 160 S.W.2d 480; and Oswald v. Caradine Hat Co., Mo. App., 109 S.W.2d 893.
Claimants then urge that they proved their case without benefit of presumption. Citing Sec. 3764, R.S.1939, Mo.R.S.A., as requiring a liberal construction of evidence, and relying solely upon the evidence (and the inferences to be drawn therefrom) most favorable to themselves, and upon conjecture and speculation, claimants argue: (1) Finerson died at work; (2) he died from inhalation of trichloroethylene; (3) Blacosolv is trichloroethylene; (4) the company used Blacosolv in its Pine St. plant, and possibly in the Forest Park Blvd. plant; (5) Blacosolv (or a drum which had previously contained Blacosolv) might possibly have been delivered to the Market St. foundry or sent there from one of the other plants; (6) such drum might have been used in preparing the mixture used that morning; (7) this mixture might have contained trichloroethylene in sufficient quantity to cause death by inhalation; (8) Finerson inhaled it; (9) this was an accident; and (10) therefore, Finerson died by industrial accident.
It was vital to claimants' case that they sustain the burden of proving both an industrial accident and death resulting therefrom. A causal connection between the two is essential. Mershon v. Missouri Public Service Corp., supra; Meintz v. Arthur Morgan Trucking Co., 345 Mo. 251, 132 S.W.2d 1010; Miller v. Ralston Purina Co., 341 Mo. 811, 109 S.W.2d 866; and Conyers v. Krey Packing Co., Mo. App., 194 S.W.2d 749. See also Griffin v. Anderson Motor Service Co., 227 Mo.App., 855, 59 S.W.2d 805. A "liberal construction of the evidence" cannot be substituted for failure of proof of any essential element of the claim. Mershon v. Missouri Public Service Corp., 359 Mo.257, 221 S.W.2d 165; Stout v. Sterling Aluminum Products Co., Mo.App., 213 S.W.2d 244, and Tucker v. Daniel Hamm Drayage Co., Mo.App., 171 S.W.2d 781.
Proof of the accident is necessary and the injury or death itself is not the "accident" or the "event." State ex rel. Hussman-Ligonier Co. v. Hughes, 348 Mo. 319, 153 S.W.2d 40, and Baird v. Gleanor Harvester Corp., Mo.App., 172 S.W.2d 892. See also Joyce v. Luse-Stevenson Co., 346 Mo. 58, 139 S.W.2d 918, and DeLille v. Holton-Seelye Co., 334 Mo. 464, 66 S.W.2d 834.
In Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W. 2d 55, where deceased fell off a truck and his neck was broken when he struck the ground, the issue was whether the cause of death was a broken neck (sustained in the fall) or heart failure (immediately before the fall). We held that claimants' evidence was "insufficient to reasonably show" that the death "resulted from a cause for which the employer would be liable." In Karch v. Empire Dist. Electric Co., 358 Mo. 1062, 218 S.W.2d 765, death resulted from coronary thrombosis and the issues were both whether or not deceased had been bitten by a tick while at work or at home, and whether or not the bite caused the thrombosis. We found that either of the two contrary inferences to be drawn from the evidence on each of these issues was reasonably possible upon the entire record and upheld the commission's award denying compensation.
Finerson's sudden death while at work was not denied, but that his death was by *746 industrial accident, or was the result of an industrial injury, were vigorously disputed. The sudden death of an employee, occurring while performing his usual work in the customary way, may or may not be due to an accident. Proof merely that the employee died while at work is not proof either that he sustained an accident while performing his work or that his death arose out of and in the course of his employment. There is no evidence whatsoever that Finerson sustained an accident while performing his work or was involved in "an unexpected or unforeseen event, happening suddenly and violently," or sustained an industrial injury resulting in death. Nor is there any evidence from which such accident or injury can be reasonably inferred.
Complainants' case is bottomed upon the assumption, conjecture and speculation that Finerson inhaled poisoned spray while at work and that such inhalation was an accident or injury. The testimony was undisputed as to: the preparation of the spray material; its customary use by all the moulders and, especially, its use that morning by 25 other moulders (and, above all, its use by Finerson and Page out of the same can or bucket) with no bad effects; the "using up" of the same "batch" of mixture by the moulders after Finerson's death; and the absence of Blacosolv (or any other chlorinated hydrocarbon) at the Market St. foundry. The overwhelming weight of the evidence was that he did not inhale poison spray and, under the circumstances, a contrary inference would be wholly unjustified. The only reasonable inference possible is that Finerson neither inhaled, nor died from, poisoned spray and hence, he neither had an industrial accident nor sustained an industrial injury.
From the entire record we find that the commission's finding and conclusion (that claimants had "failed to prove that the death of the employee was an accident arising out of and in the course of his employment") upon which the award denying compensation was made, was supported by competent and substantial evidence.
Accordingly, the judgment of the circuit court sustaining the commission's award is affirmed.
VAN OSDOL and ASCHEMEYER, CC., concur.
PER CURIAM.
The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.
CONKLING, J., and CLARK, P. J., concur; HYDE, J., concurs in separate opinion; DALTON, J., concurs in separate opinion of HYDE, J.
HYDE, Judge.
I concur in the result reached on the merits of this case, because the most favorable view of appellant's evidence affords no basis for anything more than speculation and conjecture.
However, I do not agree that a finding, such as claimants "failed to prove that the death of the employee was the result of an accident arising out of and in the course of his employment," should be held sufficient when claimants file a motion requesting more detailed findings of fact and rulings of law. I think both the Workmen's Compensation Act, Sec. 3729, R.S.1939, Mo.R.S.A., and the Administrative Procedure Act, Sec. 9, Laws 1945, p. 1504, Sec. 1140.109, Mo.R.S.A., contemplate that plain, straightforward unambiguous findings should be made at least as to the essential controverted ultimate facts. See also Annotations 146 A.L.R. 124, 151-155, 146 A.L.R. 209.
It is my opinion that such a general finding is not fair to a claimant in many cases because it does not inform him of the basis of the decision. It amounts to no more and gives no more definite information to say that the death or injury was not "the result of an accident arising out of and in the course of his employment," than it would to say "we find against claimant." I do not think we have properly interpreted the statutory requirements in heretofore approving such general findings. There are three elements which may enter into such a general finding: 1the facts; 2the law; 3the application of the law to the facts. Therefore, it is clear that such a general finding is liable to three sources of error; and it is also clear that if error occur in *747 any of these elements no reviewing court can ordinarily discover it because the constituents of the compound from which such general finding was concocted cannot be ascertained.
It is only in such a case as this, where there was a complete failure of proof, that such a finding can be harmless. That is why I concur in this case. However, I think that a claimant, at least when he definitely requests it, is entitled to have findings of fact and rulings of law which will inform him of the Commission's (and Referee's) view of the controlling facts and the law so that a reviewing court can decide whether there was substantial evidence (on the whole record) to support its view of the facts, whether it is right on the law to be applied and whether the application of correct law to the facts found will justify the result reached. If the Commission does not make a finding on essential controverted facts, the Appellate Court will likely presume (if there is substantial evidence to support it) that the facts were decided in whatever way is necessary to fit the result. Thus a litigant might lose without either the Commission or the Court actually deciding a disputed controlling fact issue. That is why the Commission should make findings on the really controlling fact issues; and I think that is what the statute intended.
DALTON, J., concurs.