228 S.W.2d 407 (1950)
SMITH
v.
NATIONAL LEAD CO.
No. 27840.
St. Louis Court of Appeals. Missouri.
March 21, 1950.
*408 Edward C. Friedewald, St. Louis, Alexander M. Goodman, St. Louis, for appellant.
Hugh D. McNew, St. Louis, Arnold J. Willmann, Clayton, for respondent.
HUGHES, Judge.
The appellant-employee, while in the course of his employment by the respondent-employer, was accidentally injured on September 1, 1948. He was on night shift duty and was at the time of the accident engaged in moving sacks of pigment (each weighing 100 pounds) by means of a hand truck, one handle of which was broken off. After he placed eight sacks on the truck he pressed down on the truck handle and one of the sacks fell from the truck and struck him and he became overbalanced and fell on his back and shoulder and the truck fell across his right leg at a point about midway between the ankle and knee, causing the injuries complained of. The accident occurred about 2:30 on the morning of Wednesday, September 1, 1948. After receiving emergency treatment the respondent's doctor bandaged his leg and he was taken to a hospital where X-rays were taken of his leg, which disclosed that there was no fracture of the bones, and on the same day at about 6:00 p.m. he was taken to his home by a friend, with directions from respondent's doctor to stir around on his leg the best he could and to come back the following Friday.
Claimant testified further that between Wednesday evening and Friday morning he tried to walk around and his leg swelled up, and on Friday morning a friend took him out to the company (employer's plant) where Dr. Heyer, respondent's doctor, saw him. The doctor looked at his leg that morning and bandaged it and gave him a walking stick and told him to stir around on it as much as he could, and told him to report to the employer's office. That he did report to the office where he was asked if he was able to do any kind of work like pushing a broom and he said that he couldn't stand up on his legs, "things swell up on me." He was then told that he would be put on "lost time" so that he would get $25 a week while he was off, to which he replied, "Okay," and he was then taken home, and was told to come back the next week for treatment. The next week he had the doctor called by telephone and told that he was not able to get out of bed. That the doctor then came to his home and examined him and told him it would get all right, and to use some ice bags on it. That was the last time he saw Dr. Heyer. The next day (September 9th) he received a telegram from respondent that his services had been *409 terminated, and on September 17th he received a letter from respondent denying any liability for medical expense. He then consulted a lawyer who sent him to Dr. Robert Mueller. That after September he did no work until two weeks before the hearing (December 20th), when he went to work at the Fairgrounds Hotel where he worked for two days and had to quit on account of his leg swelling up again.
Dr. Robert Mueller, called by appellant, testified that he had seen Wheeler Smith on four occasions, the first being September 13, 1948; at that time Smith came into his office with a cane and walked with a limp; that there were lacerations over the anterior portion of the right leg from the knee to the ankle; they were healed but still some pitting on pressure with questionable fracture or periosteal irritation; claimant said he had pain in walking and the doctor said that such condition would cause him to limp; that there wasn't much treatment, just a question of time as to when this would heal, and he told him to apply some heat; that he saw him again on September 21st, and at that time the leg was somewhat reddened, pitting on pressure on lower third and he still complained of slight hurting of back, but there were no objective findings; that he next saw him on September 28th and at that time the right leg showed a lump at the junction of the middle and one-third lateral aspect, tender to touch, and also some pitting edema on pressure over this area, and he continued to complain of his back but there were no objective symptoms. That at that time claimant had some disability. The next time he saw him was December 9th, when he found the lump on the leg continued to be present; however, there was no head and no redness and no edema; and he said at that time his back didn't bother him. That then claimant had no disability. The doctor said his bill for services was $25. The doctor was asked:
"Q. The man stated in his testimony that his leg would swell up when he used it since the date of this accident and that condition continued on until the 6th day of December, 1948, at which time he went to work, worked two days and had to quit because his leg swelled up and he couldn't continue, would you think from your examination therestate from your examination whether such complaints are justified by the injury you found? A. Yes, sir."
On cross-examination questions were asked and answers given as follows:
"Q. Now, the lacerations you saw on 9-13-48, that is the date of your first examination, did they look like fresh injuries, fresh lacerations? A. They were beginning to heal when I saw him.
"Q. Just beginning to heal. A. Nearly healed.

* * * * * *
"Q. You say they were beginning to heal. In other words, they didn't require any bandage? A. No.

* * * * * *
"Q. Healed up at that time? A. That is right. There was no scar formation.
"Q. The lacerations were healed up? A. The lacerations were completely healed.
"Q. When the man came to your office was he ambulatory? A. Yes, sir, he had to be to get around in the office.

* * * * * *
"Q. What do you mean `in the future', doctor. You had seen him just one week prior to that date. You mean he was to be seen the next week? A. Yes, the next week he came on the 28th. I also told him he should go along and not see me unless necessary.
"Q. Did you tell him that because this wound was healed up all right? A. That is right. It would do very nicely.
"Q. On the 28th you thought it wasn't necessary to see him during the months of October and November? A. That is right
"Q. Around then you thought he was in line for discharge, is that right? A. Unless something developed, yes, sir, that is correct.
"Q. In that case, doctor, how can you say that when you have testified here that he was justified in not being able to work on December 6th. You haven't examined him, you hadn't examined him during that period, you didn't know whether he was *410 able to work or not? A. When did I say that?
"Q. The attorney here asked you if he was justified in his complaint that he was not able to work on December 6th when he went to work, his leg gave him trouble? A. I didn't think that was the date.
"Q. That is the date he used. He gave you history the man went to work and asked if condition would justify that complaint and you said `yes'. A. Is that on December 6th and 7th, is that what you are referring to?
"Q. That is when he went to work and his leg swelled up and pained him. A. If, at that time he had swelling and redness and the like and it pained him I would say those particular days. You asked me question whether between September and December, those particular days I think he would be justified if that condition existed.
"Q. You havent seen him since September 28th? A. That is right.
"Q. You can't say on December 6 he wasn't able to work? A. I didn't say that. I said under certain conditions Mr. Friedewald brought out, soreness, swelling and lump I found over his leg, if that condition existed at that time it was not reasonable he would be able.
"Q. As a matter of fact, you cannot definitely state that the man was not able to work on that day? A. If
"Q. (Interrupting) Leaving out everything except the fact that you saw him last on September 28th, you don't know exactly what that man's physical condition was on December 6th? A. No, I didn't see him.

* * * * *
"Q. The man is not disabled today, is he doctor? A. I don't think he is.
"Q. He was not disabled on December 9th, when you examined him? A. On December 9th? I don't think he was disabled on December 9th.
"Q. You saw him on September 28th and the next time you saw him was on December 9th. Was he disabled on September 28th when you saw him? A. On
"Q. On September 28th. A. Just a minute. Yes, I think he had some disability.
"Q. Could he do light work? A. I think he could do light work. That would depend upon, of course, the work this boy had to do. If he had a white collared job where he didn't have to stand on his feet, if he had a clerical job, he wouldn't have any disability. If the had to be on his feet, the movement of the foot would irritate this muscle, the tibiatis anticus muscle which pulls up the foot, and if he had to walk a lot he would have some disability.
"Q. That was on September 28th? A. That was on September 28th, that is right."
Dr. O. C. Heyer, called as a witness by the respondent, testified as follows: He was called to respondent's plant at 3:00 o'clock in the morning of September 1, 1948, where he examined Wheeler Smith; he found some skin abrasions on the right shin and swelling of underlying tissues in the medial third and extending down to the upper portion of the lower third of the right leg; at the moment he wasn't able to determine how serious it might be because of the way Smith acted or complained; he had to assume it might be more serious and gave him first aid with bandage on the abrasion and laceration and had him sent to St. Mary's Infirmary; he told them to admit Smith and take X-rays to see if there was a fracture; he saw Smith that afternoon; the result of the X-rays was negative for fracture; he told Smith that it would not be necessary to be hospitalized any longer, and told him he could go home, and gave him instructions as to what he thought the proper thing to do; he saw Smith two days later and there was not much difference; there was some swelling and eventually some tenderness; there was no bleeding or deep injury, and he was of the opinion that Smith was able to do some light work and that the injury was not too serious, and he sent Smith over to the Industrial Relations Department; Smith was supposed to come back in two, three or four days, but he did not come; that was on September 3d, and on September 8th the Industrial Relations Department asked *411 him to go to see Smith at his home because he hadn't come to work; he saw Smith who was lying on the bed with his clothes on; it appeared to him that the swelling had receded very well and there was perhaps some tenderness there. The following questions and answers were given:
"Q. In your opinion was the man able to work? A. Yes, sir.
"Q. Able to do regular work? A. Yes, sir, from then I think so."
On cross-examination the doctor testified as follows:
"Q. Do you remember when you saw him on that day at his home. Did you tell him to use ice bags? A. Yes, I told him that. I told him to keep on using ice bags to reduce the tenderness and swelling.
"Q. He wasn't completely well when you saw him on Biddle Street? A. In my personal opinion, yes, sir.
"Q. Why did you prescribe ice bags? A. Well, enough to work. He was not bed fast.
"Q. A lot of that would depend on how much swelling developed when he used his leg, is that right? A. That would determine his degree of disability.
"Q. Of disability? A. I don't think the size of the swelling, extent of swelling will influence the ability to work.
"Q. And would the pain? A. Pain?
"Q. Doesn't pain accompany swelling? A. Not necessarily.
"Q. Where there is a circulatory disturbance he would not have pain? A. Not necessarily."
George Henry Hoesch, called as a witness by the respondent, testified: He is an employee of respondent in the Industrial Relations Department. On September 3, 1948, Wheeler Smith came to his office; the purpose of Smith's call was that after an examination by Dr. Heyer, Dr. Heyer recommended that he do light work, then the following questions and answers:
"Q. Did you attempt to find light work for Mr. Smith? A. Yes, he went to see Mr. Fiock and he arranged light work.
"Mr. Friedewald: I object to any conversation any other person told Mr. Hoesch.
"Mr. McNew: He had Mr. Fiock arrange for light work. Who made the arrangements for light work? A. Made arrangements with Mr. Fiock to give him light work.
"Q. Was the arrangement made through the foreman of the plant? A. Yes.
"Q. Was Wheeler Smith put on light work? A. No, he refused to do it.
"Q. What was he told when he refused to do light work? A. Advised to go back to see the doctor the following day.
"Q. Did he come back the next day? A. No.
"Q. Did he come back the next day after that? A. No.
"Q. Did he come back at all? No.
"Q. When he didn't come back at all, what arrangements did you make for him? A. I had Dr. Heyer check him about a week later.
"Q. Would your file show what date that was? A. I think it was the 8th.
"Q. Did Dr. Heyer go out to see the man on the 8th? A. Yes, sir.

* * * * *
"Mr. McNew: (Continuing) Did Mr. Smith call you at any time during the week after he had been in on September 3rd? A. No, heI never talked to him.
"Q. Did he ever return to work at all? A. No."
The award of the referee, later affirmed on review by the Industrial Commission of Missouri, was in favor of the employee (appellant here), and for temporary total disability in the sum of $25 per week for 13 4/7 weeks, being from September 1, 1948, to December 6, 1948, a total sum of $339.28, and for necessary medical aid in the sum of $25. An appeal was taken by the employer to the circuit court, and on review the circuit court set aside the award and reversed and remanded the case for further hearing by the commission as to the extent and period of disability. From the judgment of the circuit court the employee has perfected an appeal to this court.
In his first point appellant charges that the circuit court in reversing the award of the commission ignored the established *412 principle of law that a court in reviewing the findings of an administrative tribunal must adhere to the rule of deference as to the findings involving the credibility of witnesses by such tribunal before whom the witnesses gave oral testimony, and cites the case of Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.W. 2d 647. Of course, it is the duty of the court on review of the proceedings in a compensation case to pay deference to the finding of the referee before whom the evidence was heard, but this does not mean that the court must close its eyes and blindly follow such finding. If that were the rule nothing would be gained on appeal although the court upon consideration of the record as a whole deemed the finding contrary to the overwhelming weight of the evidence, or that the referee could not have reasonably arrived at such finding. It rather means that where the question is close and the evidence might justify a finding either way, and where the credibility of the witnesses is questioned, the court should give regard and consideration to the fact that the referee because of his hearing the witnesses testify and observing their demeanor and apparent willingness or reluctance to relate the facts truly was in a more favorable position to judge as to the credibility of the witnesses, and then pay such deference to his opinion as it believes proper.
If the court upon consideration of the whole record is satisfied that the finding of the referee is unreasonable or contrary to the overwhelming weight of the evidence, then notwithstanding deference to the opinion of the referee as to credibility of witnesses it should decide the case in accordance with what appears to the court to be just and right. In this case the circuit judge filed a memorandum in which he stated that he had fully considered the case of Wood v. Wagner Electric Corporation, supra, and that he had in mind the admonition in that case, which means that he did give regard and deference to the referee's opportunity to see and hear the witnesses, and notwithstanding differed with the referee.
But appellant says that there was substantial evidence to support the finding of the referee and the commission, and, therefore, the courts on appeal are bound thereby and cites the case of Henderson v. Laclede Christy Clay Products Co., Mo.App., 206 S.W.2d 673, and the case of Johnson v. Fogerty Bldg. Co., Mo.App., 194 S.W. 2d 924, as supporting that contention. Such was the rule prior to the adoption of the new Constitution providing by Section 22 of Article V, Mo.R.S.A., that administrative decisions shall be subject to direct review by the courts as provided by law. After the new Constitution became effective, but before the Supreme Court construed said Section 22 in the Wood case, and later in other cases, including Karch v. Empire Dist. Electric Co., 358 Mo. 1062, 218 S.W.2d 765, cited by appellant, we followed a long line of cases in the Johnson case holding as appellant contends. Afterwards this court decided the Henderson case, in which we cited the Johnson case, but not on the point appellant claims. We said in the Henderson case, "The Appellate Court is not bound by the former rule that it must uphold the finding and award of the commission if there is any substantial evidence to support it. This is true because of Section 22, Article V, Constitution of Missouri of 1945, Mo.R.S.A., which provides as follows: `All final decisions, findings, rules and orders of any administrative officer or body existing under the Constitution or by law, which are judicial or quasi-judicial and affect private rights, shall be subject to direct review by the courts as provided by law; and such review shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record.'" [206 S.W.2d 675.] But the Henderson case was cited in support of our holding that the commission was not bound by the percentage estimate of a doctor as to disability but could fix its own percentage estimate of disability.
The burden of proof was on the claimant to show that while in the service *413 of this employer he received accidental injuries which arose out of and in the course of his employment. This much the employee did prove in this case. But his burden did not stop there; it went further. It required that he produce competent and substantial evidence showing the duration and extent of such injuries. That is, did his injuries result in total disability, and if so for what length of time; or, did such injuries result in partial disability, and if so for what length of time; or, was he totally disabled for a time and thereafter partially disabled for a time? In other words, while the commission must fix the extent and duration of the disability, it must have sufficient competent and substantial evidence before it to enable it to do so.
The claimant testified that from the day of the accident, September 1st, to September 8th, the last time Dr. Heyer saw him, he was unable to stand on his feet because his leg swelled up and pained him. But as to the time after September 8th he was not asked and did not testify as to his ability to use his leg or whether he did use it, or how he used it, until December 6th. He was asked whether he had done any work after September 8th and his answer was that he had worked two days (December 6th and 7th) at Fairgrounds Hotel, where he had to quit because his leg swelled up on him again. But he was not asked and did not tell the kind of work he did at the Fairgrounds Hotel, whether it required him to be on his feet all day, or whether it was light or heavy work. He was not asked and said nothing about his ability to work after September 8th, but merely said he had not worked since September except the two days at the Fairgrounds Hotel. His testimony that he did not work is not substantial evidence that he could not work. He said nothing whatever in his testimony about any injury or pain to his back. Dr. Mueller saw claimant four times, to wit, September 13th, 21st and 28th and December 9th. He never at any time discovered any objective signs of a back injury. On September 13th he found scars from lacerations, which he first said were beginning to heal, and then he said were nearly healed, and finally said were completely healed. On September 28th he said he found a lump on Smith's leg. At that time he told Smith to go along and not come back unless necessary; that it would do very nicely, and he thought it wasn't necessary to see Smith during October and December, and he though Smith was in line for discharge from medical aid unless something developed. He further said he thought Smith could do light work on September 28th "If he had a white collared job where he didn't have to stand on his feet, if he had a clerical job, he wouldn't have any disability," and that "if he had to walk a lot he would have some disability." Dr. Mueller could not have believed the lump on claimant's leg that he found on September 28th was disabling, because he said it was still there on December 9th, at which time he said claimant was not disabled. On the other hand, Dr. Heyer testified that he last saw claimant on September 8th, and from then on he thought claimant was able to do regular work.
Taking the testimony as a whole, we are unable to see how the commission could reasonably find that this employee was totally disabled after September 8th or for what length of time he was totally disabled. This man did receive an accidental injury which arose out of and in the course of his employment, but whether the resulting disability was total or partial, and its duration, was left unproven, more from a paucity or lack of proof that could have been made than from the evidence that was adduced. The case of Caldwell v. Melbourne Hotel Co., Mo.App., 116 S.W.2d 232, cited by appellant, is based on facts so dissimilar from the facts in this case that it is of little value in determining the issues here involved. In that case there was no insufficiency of evidence on the claimant's part to establish total disability, and there was no evidence whatever to warrant a finding by the commission of permanent partial disability, whereas in this case the evidence, so far as it went, was insufficient to reasonably show whether the disability was total or partial, or its duration.
The award as made by the commission was not supported by competent and substantial evidence upon the whole record, *414 and, therefore, should be set aside and the case reversed and remanded to the commission for further hearing as to the extent and period of disability, as directed by the circuit court.
The judgment of the circuit court should be and is affirmed.
ANDERSON, P. J., and McCULLEN, J., concur.