**J. Elwood FOGELSONG, Respondent,**

v.

**BANQUET FOODS CORPORATION, Appellant.**

No. KCD 27458.

Missouri Court of Appeals, Kansas City District.

Aug. 4, 1975.

Motion for Rehearing and/or Transfer Denied Sept. 2, 1975.

Christian F. Stipp, Stipp & Ferguson, Carrollton, for appellant.

David P. Macoubrie, Cleaveland & Macoubrie, Chillicothe, for respondent.

Before SWOFFORD, P. J., and ROBERT R. WELBORN and ANDREW J. HIGGINS, Special Judges.

ANDREW J. HIGGINS, Special Judge.

Appeal by employer from that part of judgment affirming award of the Industrial Commission of Missouri to employee of $18,720 permanent partial disability of ninety per cent of his body as a whole (360 weeks at $52.00 per week). Appellant concedes employee's permanent partial disability to the extent of 50 per cent of the right arm at the elbow (105 weeks at $52.00 per week —$5,460), but contends the evidence is not sufficient for permanent partial disability of ninety per cent of the body as a whole.

Employee's claim for compensation alleged:

"11. Parts of body injured. Right hand, arm, elbow, shoulder, neck, low back, nerves, eyes bothersome since accident, possible brain injury.

"14. Exact nature of any permanent injury. Right hand, arm, elbow, right shoulder, cervical and lumbar area of spine, highly nervous, eye difficulty, possible brain injury."

It was stipulated at the hearing on employee's claim: that on May 30, 1969, employee, while in the employ of employer, suffered an accident arising out of and in the course of his employment and sustained an injury as a result; that the compensation rate is $57.00/$52.00; that compensation had been paid employee by employer for temporary total disability for thirty-four weeks in sum $1,938.00, medical aid in sum $3,565.15, medical expenses in sum $668.00, and travel expenses in sum $1,324.20; that prior to May 30, 1969, employee had a 10 per cent permanent partial disability to the body as a whole as a result of a prior injury sustained by employee to his back while in the Armed Forces.[1]

Jesse Elwood Fogelsong, born August 10, 1933, went to work for Banquet Foods Corporation at its plant in Carrollton, Missouri, in March 1969. On May 30, 1969, he slipped on a piece of meat, fell to the floor and against a turning augur. The augur caught his right arm and continued to turn, jerking him during such turning. The augur was subsequently stopped, but about forty-five minutes passed before his arm could be freed. When he fell, Mr. Fogelsong grabbed the augur casing with his left hand, at which time he hit his head on the casing. He had a sore spot on the left side of his head the next day and had a severe headache the second day after the accident. He experienced speech problems shortly after the accident when he arrived at a Kansas City hospital later in the day. None of these conditions existed prior to the accident. Fellow employees at Banquet experienced difficulty in removing Mr. Fogelsong from the augur because it was straining him up rather than pulling off his arm. His body was placed inside the casing and a jackhammer was used in the course of his release. The jackhammer made a deafening noise, producing an unbearable situation.

From 1957 to March, 1969, Mr. Fogelsong worked for Thomas Houston Peanut Company as a salesman. He worked regularly and had no physical difficulties in performing his work. He was hospitalized in July and September, 1959, but since 1960, up to May 30, 1969, worked regularly, met the public, had no speech or physical difficulties, no seizures, blackouts or mental or emotional difficulties. He performed whatever work was required of him and was in

1. There was no stipulation whether the service-connected disability was in any way industrially disabling.

no way hampered by the service-connected back injury. He was examined by the company doctor, Jack L. Vinyard, M.D., May 19, 1969. Dr. Vinyard's report noted that Mr. Fogelsong, while in service, had surgery to the right side of his head and that he sustained a low back sprain. Dr. Vinyard found him acceptable for unlimited employment and noted that he had no residual neurological or orthopedic disfunction.

Mr. Fogelsong has undergone five surgeries on his right arm. He has jerking in his neck and left eye. He cannot remember well, cannot concentrate, has difficulty thinking and talking, and has experienced several seizures since his accident. None of these conditions existed between 1960 and May 30, 1969. He has tried to work on a tank truck in Chillicothe, but could not find his way around or think where to go. He cannot talk or work and he cries when he tries to talk. He had no emotional or mental difficulties between 1960 and May 30, 1969, but, since his accident, his mental and emotional condition has deteriorated. Neither of the service injuries to his back and head hindered him from performance of his work at Banquet. He was honorably discharged from the service.

Mr. Fogelsong experienced convulsions and blackout spells between 1953 and December, 1959. He also bit his tongue on two occasions and had smelled foul odors. In 1959 he was treated with Dilantin and underwent a right parietal craniotomy at the Veterans Hospital for possible progressive hemiparesis. No tumors were found and he was discharged from the hospital in December, 1959. He had no further treatment for any such condition up to and including May 30, 1969. Since his accident he has had to resume various medications and does have various muscle weaknesses.

Wilma P. Fogelsong has observed the changes in her husband's condition. Prior to May 30, 1969, he was of a happy disposition, met the public, and was active in school and church affairs. He had no speech difficulties prior to May 30, 1969, in his sales job with the Houston company. Also prior to May 30, 1969, he had a business involving three trucks and supervision of twenty people. On May 31, 1969, when she visited her husband at the hospital, he tried to tell her what happened. She could not understand him and she called Dr. Overesch who also noted the speech problem. His speech problem and nervous condition have worsened; he relives the accident, has nightmares about it, and sleeps about two hours at a time. He is unable to work. He stays in the house, and when he has bad spells, he shuts himself away from the children. Mrs. Fogelsong was aware of the conditions treated and operated by the Veterans Hospital in 1959, after which her husband's condition improved as predicted by the Veterans Hospital doctor.

Reverend John Gooding knew Mr. Fogelsong between June, 1958, and 1965 when he was pastor of the Liberty Methodist Church in Chillicothe. He knew Mr. Fogelsong as an excellent church worker possessed of stable personality and emotions. He had no speech defect and was not introverted. Reverend Gooding visited with Mr. Fogelsong two or three times after the accident of May 30, 1969, and noted the quick deterioration in his friend's emotional and physical condition.

In addition to observation of the employee during his testimony, the referee, upon request, made specific observations for purpose of disfigurement, at which time the referee also received a picture of the extent of employee's disability.

Immediately following the accident, Mr. Fogelsong was examined and treated by Dr. Vinyard, who also referred and transferred him by ambulance to Research Hospital in Kansas City for treatment by Harry B. Overesch, M.D., a specialist in orthopedics. Dr. Vinyard described employee's injury as "severe deep laceration involving the right wrist joint through the joint on the palmer surface, severing tendons, blood vessels and

nerves * * * additional deep lacerations involving the forearms to the bone with deep lacerations involving the muscle bodies and at the elbow." He administered shock therapy and tied off the bleeding arteries.

Dr. Overesch first saw Mr. Fogelsong in the emergency room at Research Hospital on May 30, 1969, where he was taken to surgery and the lacerations and wounds were scrubbed and irrigated and surgically repaired. He remained at Research until June 14, 1969, during which time he was placed on antibiotics and splints were made for his right upper extremity. The splints were changed along with dressings on two occasions. He was dismissed to the care of Dr. Vinyard. Dr. Overesch saw his patient again August 20, 1969, and March 1, 1972. In the interim, Mr. Fogelsong had been to Dr. Chandler, a plastic surgeon, for further surgery and rehabilitation of his right hand. On March 1, 1972, Dr. Overesch again noted Mr. Fogelsong to have a severe speech impediment as well as epileptic-type seizures for which he had seen two neurologists and had been taking Dilantin. He was also noted to show marked depression and deterioration since previous observation.

Upon hypothetical questions, it was the opinion of Dr. Overesch that the disability as a result of the injury May 30th to the arm "would be in the neighborhood of approximately 50 percent of the right upper extremity at or above the elbow." Dr. Overesch was also of the opinion that his patient's condition as noted March 1, 1972, and since, was "aggravated by the accident of May 30th, 1969 * * * that he has a permanent disability, total disability."

R. Allen Chandler, M.D., a specialist in plastic, reconstructive, and hand surgery, examined Mr. Fogelsong September 3, 1969, and subsequently performed recommended surgery. He was of the opinion that Mr. Fogelsong would have "a considerable amount of permanent partial disability." Specifically, with respect to the injured

member, Dr. Chandler "would give this patient a permanent partial disability of approximately 50% of the right hand rated at the elbow joint." He made no rating on disability to his patient's whole body.

Donald C. Sanders, M.D., a psychiatrist, reported his diagnosis of Mr. Fogelsong:

"1. Depressive Reaction, Chronic with Hysteroid and Conversion-type Symptoms.

"2. Schizoid Personality Profile.

"3. Epilepsy, Mixed Type, Etiology Unknown.

"4. Muscle and Nerve Limitations, as sequellae from old traumatic injury to the right arm and hand."

Dr. Sanders referred his patient's mental disorders to "traumatic neurosis which has been only indirectly associated with the traumatic injury to the right hand."

Appellant states its position, viz.: "There is no question but what at the time of the hearing * * * the Employee suffered a total disability, ten per cent of which was attributable to an injury to his back which he sustained while a member of the armed services and ninety per cent of which was attributable to other causes. The question * * * is whether * * * there is sufficient competent evidence * * * to support an award based on a finding that the Employee's accident of May 30, 1969 caused or resulted in a permanent partial disability of ninety per cent of the body as a whole."

Appellant emphasizes employee's medical history of hemiparesis, blackouts, convulsions and seizures, treated by the Veterans Administration Hospital both prior and subsequent to the accident and the opinions of Drs. Chandler and Overesch that the employee sustained a permanent partial disability of fifty per cent of the right arm at the elbow, to support an assertion that the employee failed to meet his burden to prove by competent substantial evidence the ex-

tent of the disability which resulted from the accident of May 30, 1969, and, therefore, the award may not stand. See *Smith v. National Lead Co.*, 228 S.W.2d 407, 412[4] (Mo.App.1950); *Griggs v. A. B. Chance Co.*, 503 S.W.2d 697, 703[1–5], 705[9] (Mo.App. 1973).

Appellant also asserts that employee's condition was such that expert opinion was essential to show it was caused by the accident to which it is ascribed. See *Nick v. International Shoe Co.*, 200 S.W.2d 590, 593[5, 6] (Mo.App.1947).

Appellant's argument is that this is "a situation in which an employee is found to be 100% disabled. Of this 100% disability, 10% is attributable to an accident which the employee sustained prior to an industrial accident and 90% is attributable to other causes. The employer is liable for the payment of compensation for whatever part of that 90% was caused by the industrial accident. * * * But the employer is not liable for that part of the disability which was not caused by or attributable to the industrial accident. If the expert medical evidence shows that a part of the 90% of the disability was caused by and attributable to the industrial accident and a part was the result of other causes, then expert medical testimony must show how much of the 90% of the disability was caused by or attributable to the industrial accident."

■ Where the evidence shows that an industrial accident caused a disability or aggravated a pre-existing condition or infirmity of an employee which produced a condition which would not have resulted in a normal, healthy individual, the Industrial Commission of Missouri is authorized to make an award. *Mashburn v. Chevrolet-Kansas City Div., G. M. Corp.*, 397 S.W.2d 23, 29[7] (Mo.App.1965); *Gennari v. Norwood Hills Corp.*, 322 S.W.2d 718, 722[10] (Mo.1959).

Under this proposition the evidence shows, and the Industrial Commission reasonably could find, that Mr. Fogelsong's accident of May 30, 1969, caused his disability or aggravated a pre-existing condition to cause the disability he sustained.

Contrary to appellant's assertion, and except for its assumption that Mr. Fogelsong had a ten per cent permanent disability attributable to an accident he sustained prior to his industrial accident of May 30, 1969, it is undisputed and uncontradicted that any such prior injury was not industrially disabling in that it did not in any way restrict or interfere with his performance of any kind of work in which he engaged including his work at Banquet Foods.

It is true that Mr. Fogelsong had an injury to his back and head while in the Armed Services; that he was given a ten per cent disability compensation for his back injury by the Veterans Administration; and that he had medication and surgery for correction of various problems associated with his brain. However, the evidence shows he was successfully treated for any such injuries, and that he was functional and worked without disability from 1960 to May 30, 1969. His disability-free condition at the time he entered Banquet's employ was verified by that company's own doctor fourteen days prior to the accident.

While in a disability-free condition Mr. Fogelsong sustained subject traumatic injury to hand, arm, shoulders, head, and nerves. Speech impediment was noted within hours of the accident and neurological problems were noted by Dr. Overesch in his report of August 29, 1969. Mr. Fogelsong was again on Dilantin for such problems and he had not taken any such drug between 1960 and the date of his accident May 30, 1969. Dr. Sanders noted mental disorders in Mr. Fogelsong referable to subject trauma as well as muscle and nerve limitations specifically referable to the hand and arm injuries. Dr. Sanders described all such manifestations as severe and disabling mental problems. All of Mr. Fogelsong's problems following his accident

have rendered him totally disabled. He is unable to function as a person, much less able to work.

▉ Despite employer's attempts to limit Mr. Fogelsong's disability to his hand and arm, specifically through the rating accorded Mr. Fogelsong by Dr. Chandler and accepted by Dr. Overesch, the evidence shows that Mr. Fogelsong sustained injury to other portions of his body, the most severe of which was to his head and nerves. It is not required that an award be limited to matters of physical injury and accompanying loss of members, scars or disfigurement. Missouri is in the majority of jurisdictions which recognizes that even in the absence of physical impact there is accidental injury or personal injury within workmen's compensation acts where an employee suffers a nervous disability from sudden shock, fright, or other emotional stimuli. *Todd v. Goostree*, 493 S.W.2d 411, 417[10], 420[11] (Mo.App.1973). Anno. 109 A.L.R. 892. It is not argued that Mr. Fogelsong's experience while awaiting rescue from the augur which imprisoned him was not sufficient to produce shock, fright and emotional stimuli sufficient to produce his mental disorders and disability.

▉ Medical testimony is not required to establish cause and disability where those matters are within the understanding of lay persons. Mr. Fogelsong's own testimony and that of his wife and pastor constitute competent evidence on his disability-free condition prior to his accident and his total disability as a result of the accident. " * * permanent partial disability as found under the 'catchall' part of Section 287.190 RSMo, V.A.M.S., can be *inferred* from the whole evidence, although there be no single positive declaration to that effect. The commission is not solely dependent upon medical evidence. The finding is to be made from the whole evidence. * * * The testimony of the claimant or other lay witnesses as to facts within the realm of lay understanding can constitute substantial

evidence of the nature, cause, and extent of the disability, especially when taken in connection with, or supported by, some medical evidence." *Davis v. Brezner*, 380 S.W.2d 523, 528[11–13] (Mo.App.1964). "The Commission is authorized to base its findings and award solely on the testimony of a claimant. His testimony alone, if believed, constitutes substantial evidence to establish that he sustained an injury * * * and * * * 'of the nature, cause, and extent of his disability.' " *Smith v. Terminal Transfer Co.*, 372 S.W.2d 659, 665[10] (Mo. App.1963).

Not only is there competent lay testimony as to Mr. Fogelsong's injury and the nature, cause and extent of his disability, Dr. Overesch provided expert testimony that "he has a permanent disability, total disability." Both Drs. Overesch and Chandler recognized the extent of disability referable to Mr. Fogelsong's hand and arm alone, and Dr. Sanders supplied expert testimony as to his nervous and mental disability.

▉ Extent and percentage of disability is a finding of fact within the special province of the Industrial Commission, *Lowery v. AFC Industries, Incorporated*, 428 S.W.2d 7, 10[3] (Mo.App.1968), *Davis v. Day-Brite Lighting, Incorporated*, 366 S.W.2d 84, 88[4] (Mo.App.1963); and the Commission is not bound by the medical testimony but may consider all the evidence, including the testimony of the employee, and draw all reasonable inferences from other testimony in arriving at the percentage of disability, *Haggard v. Snyder Construction Co.*, 479 S.W.2d 142 (Mo.App. 1972).

▉ Appellant concedes employee's fifty per cent partial disability to his right arm at the elbow and his total disability at the time of the hearing. It already has been demonstrated that the Industrial Commission reasonably could find that the employee was permanently totally disabled as a

result of his accident, and the referee made, and presumably reported, his observations of the employee's inabilities, disabilities, and infirmities. Such circumstances would support an award of total or one hundred per cent permanent disability, and would thus support an award of ninety percent permanent partial disability which the Commission in its special province fixed as the percentage or extent of Mr. Fogelsong's disability. *Haggard v. Snyder Construction Co.*, supra, 479 S.W.2d l. c. 145.

Appellant relies principally on *Griggs v. A. B. Chance Co.*, supra, which is readily distinguished in that the employee's doctor admitted that insofar as disability was concerned, any attempt on his part to ascribe all or any part of the 25 per cent disability which he found in employee's body to the accident in question would be medical speculation, conjecture and surmise on his part. 503 S.W.2d l. c. 702, 705[9].

Judgment affirmed.

All concur.